GRANITE CONSTRUCTION COMPANY, THE STATE OF NEVADA, EX REL. DEPARTMENT OF HIGHWAYS, APPELLANTS AND CROSS-RESPONDENTS, v. TRACY LYNN RHYNE AND CHARLES W. RHYNE, RESPONDENTS AND CROSS-APPELLANTS.

No. 20449

October 2, 1991                           817 P.2d 711

[Rehearing denied December 23, 1991]

*Perry & Spann* and *Thierry V. Barkley,* Reno, for Appellants and Cross-Respondents.

*Victor G. Drakulich,* Reno, for Respondents and Cross-Appellants.

*Hamilton & Lynch,* Reno, for Amici Curiae, Association of Trial Lawyers of America and Nevada Trial Lawyers Association.

# OPINION

By the Court, SPRINGER, J.:

This is an appeal from a judgment of the Second Judicial District Court entered on a unanimous jury verdict for compensatory and punitive damages. Although other errors are assigned,[1] the principal question is whether the trial judge, the Honorable Jerry Carr Whitehead, erred in allowing the verdict for punitive damages to stand against Granite Construction Company. We hold that Judge Whitehead committed no error and therefore affirm the district court judgment, including the judgment for punitive damages.

Tracy Rhyne was seriously injured when her vehicle collided with a large bull on Interstate 80 east of Reno. The collision resulted from Granite Construction's decision not to honor a provision of its highway construction contract with the State of Nevada, which specifically required Granite to protect users of the highway under construction by furnishing protective fencing that would "prevent livestock from straying upon or across the right-of-way." Although Granite thus expressly agreed to protect highway users from this known and expressly acknowledged risk, and was paid by the State of Nevada for doing so, there is evidence to support the conclusion that Granite deliberately elected *not* to construct protective fencing on the south side of the highway and that it made this decision in order to save itself time

---

[1]Granite assigned as error the trial court's allowing the jury to take a dictionary into the jury room. The trial court remarked: "[T]he Court has examined the definition of the words they listed and has found nothing in them which would have had a tendency to influence the jury to reach a verdict inconsistent with the legal proofs and Court's instructions." There is nothing in the record that would lead us to reject the trial court's observations and conclusions.

With respect to the other claims of error, we conclude that the trial court was acting within the scope of its discretion when it allowed Trooper Davenport to give his opinion on driver error (*see* Cheyenne Construction v. Hozz, 102 Nev. 308, 311, 720 P.2d 1224, 1226 (1986)) and when it allowed the Rhynes to amend their complaint to include a claim for punitive damages.

and money on the construction project. Granite was paid by the State to protect the public; and the company consciously decided, for its own benefit, to put the public at risk by pocketing as profit the money the State was paying Granite to build the protective fencing. These facts show that Granite "consciously and deliberately disregarded known safety procedures," safety procedures which Granite expressly agreed to take care of when it signed the highway construction contract. Leslie v. Jones Chemical Co., 92 Nev. 391, 393, 551 P.2d 234, 235 (1976). Judge Whitehead properly concluded that punitive damages are allowable under such circumstances. NRS 42.005 (formerly NRS 42.010) (punitive damages awardable where defendant "guilty of . . . malice, express or *implied* . . . ." (emphasis added)). *See* Nevada Cement Co. v. Lemler, 89 Nev. 447, 514 P.2d 1180 (1973) (punitive damages approved where air polluter had "full knowledge" of dangerous pollutants being emitted, yet acted in "wanton disregard of the rights and properties of others . . . .").

Judge Whitehead correctly ruled that in the *Leslie* case, cited above, "the Nevada Supreme Court held that punitive damages may be awarded against a corporation when there is a conscious and deliberate disregard of known safety procedures by management personnel." In making this ruling Judge Whitehead commented:

> In the instant case, both the general contract between the State and Granite and the subcontract between Granite and Tholl required the construction of a cattle containment fence. Testimony established that cattle containment fencing is used as a safety measure to prevent cattle and other livestock from gaining access to the highway. Testimony further established that the defendants made a conscious and deliberate decision not to enforce that provision of the contract and that for approximately two months, there was no fencing whatsoever on the southside of Interstate 80.
>
> Thereafter, Granite learned that there was at least one bull in the fields directly adjacent to Interstate 80. There was evidence presented that Granite took no steps to enforce the cattle containment fencing provision and took no other meaningful steps to prevent the bull from gaining access to the highway.

Giving added strength to Judge Whitehead's comment is the admission by Granite's superintendent, James Markwardt, that Granite was working under time pressures and that if Granite had proceeded to install the safety fence in accordance with its contract, the job would not be completed within the time specified in the contract. Even though there may be some evidence that could

lead to a contrary belief, the jury was certainly justified in concluding that Granite was taking a short cut, that it was trying to avoid burdensome financial penalties attached to late completion and that it therefore deliberately and with knowledge of the potential danger decided not to erect the safety fence. The jury could have easily and logically concluded that such actions on the part of Granite Construction Company constituted a conscious and deliberate disregard of the safety of motorists traveling along the unprotected highway.

Judge Whitehead was very precise and absolutely correct in his legal ruling in this case, namely:

> After having carefully considered the evidence, the Court believes that substantial evidence was presented by the plaintiffs which would enable the jury to conclude that (1) the defendants consciously and deliberately disregarded known safety procedures by failing to enforce the contract provision which required a temporary cattle containment fence and (2) that Granite, after having learned of the bull's presence, failed to take any meaningful corrective measures to prevent the bull from gaining access to the freeway.

It is difficult to see how Judge Whitehead could have ruled otherwise; and we agree with his determination that the jury's imposition of punitive damages in this case was fully supported by the law and the evidence. The judgment of the trial court is affirmed.

Rose, J., concurs.

Mowbray, C. J., concurring:

I join in the court's opinion, but write separately to express my concern over the legal hair-splitting that plagues this area of our law.

NRS 42.005 (formerly NRS 42.010) allows punitive damages to be awarded where the defendant is guilty of "malice." That, however, is both the beginning and ending of consensus in this area of the law. The subtle, often imperceptible distinctions between "express malice" and "implied malice," and "malice in fact" and "malice in law" engender spirited debate in courts across the land. Not surprisingly, this court has not been immune to the controversy, and, as a result, our past decisions offer no clear resolution.

What is clear, however, is that our preoccupation with such legal niceties must not provide a loophole for defendants whose gross and wanton misconduct cries out for punitive sanctions. The jury here found that the defendant consciously and deliber-

ately disregarded known safety procedures—procedures designed to protect the public from serious harm—to save a few dollars.[1] To punish this conduct and deter others from committing similar outrages, exemplary damages are both necessary and appropriate, no matter what interpretation of "malice" we choose to employ.

STEFFEN, J., with whom YOUNG, J. joins, dissenting:

Because the majority's affirmance of punitive damages is contrary to the decisional law of this state, I am compelled to dissent. I do, however, concur in affirming the judgment below as it relates to the award of compensatory damages.

There is no evidence in this record that would support the proposition that Granite harbored an intent to cause injury by failing to assure the erection of secure fencing to prevent livestock from gaining access to the right-of-way under repair. In fact, the record reveals that the state engineer approved, in advance, performing the relevant work on the south side of the project without erecting a temporary cattle containment fence, thus waiving the contractual obligation imposed by the State to provide such a fence. The State's waiver was based upon a number of factors, including a mistaken understanding on the part of the state engineer, Granite, and the fencing subcontractor, that no livestock remained in the area affected by the work. While the right-of-way fence along the south side of Highway 80 was in the process of being removed, a bull was seen in the vicinity by employees of the fencing subcontractor and by Granite's project superintendent. After seeing the animal, the superintendent directed another Granite employee to locate the bull and its owner in order to have it removed from the area. On several occasions the superintendent also ordered that the Nevada Highway Patrol be contacted for assistance in relocating the animal. Unfortunately, Granite's efforts were inadequate as the bull was neither found nor removed prior to the time it wandered onto the highway where it was hit by the vehicle driven by Tracy Lynn Rhyne. The facts of record simply do not constitute a basis for punitive damages under Nevada law. Unquestionably, Granite's actions may be viewed as negligent or perhaps even grossly negligent, and therefore a justifiable basis for an award of compensatory damages. However, there is absolutely no basis for a finding that Granite acted with actual malice. The record is bereft of evidence indicating that Granite acted with a purposeful intent or motive to

---

[1]As the majority makes clear, there is ample evidence to support the jury's conclusion. Nevertheless, the dissent disregards the jury's findings in favor of the factual scenario propounded by the defendant. Admittedly much of the evidence is conflicting, but it is for the trier of fact to weigh the evidence, not the reviewing court. *See* Bolden v. State, 97 Nev. 71, 624 P.2d 20 (1981).

injure anyone.[1] The majority nevertheless concludes that punitive damages are supportable under a subtly presented theory of implied malice, or malice implied in law. The majority thus attempts to perpetuate the fantasy that Nevada statutory and decisional law has recognized implied malice as a discrete basis for awarding punitive damages.[2] Although I will avoid repeating the text of the plurality opinion in Craigo v. Circus-Circus Enterprises, 106 Nev. 1, 786 P.2d 22 (1990), much of what was said there demands repeating here in response to the position announced by the majority.

Despite the timidity with which the majority underscores *implied* malice as support for the proposition that NRS 42.005 allows punitive damages for ''consciously and deliberately disre-

---

[1]The majority ascribes to Granite a willingness to take a ''short cut'' in order to avoid financial penalties that would have been imposed if the highway project had not been completed within the time limitations prescribed by the contract. What the majority fails to recognize is that *the State* also had an interest in securing the timely completion of the work, and the state engineer thus agreed that since there was no livestock that would threaten the right-of-way along the south side, there would be no need to burden the project with the needless erection of a cattle containment fence. The fact that the work proceeded for a matter of weeks without the erection of fencing along the south side of Interstate 80, until the bull was seen, reflects favorably on the understanding of all parties concerning the complete absence of cattle in the relevant area. The record simply does not support the inference that Granite balanced the need to erect a containment fence against the prospect of financial gain in deciding not to require the construction of the fence. Granite's misinformation concerning the lack of danger from animals was fully shared by the state engineer and the fencing subcontractor in determining not to erect the fencing. Indeed, as noted above, the state engineer waived the requirement to construct such fencing. There is no evidence in the record to suggest that Granite or the fencing subcontractor, let alone the state engineer, acted in bad faith in proceeding under the understanding that the relevant area was free of cattle.

[2]In the amici curiae brief filed by the Association of Trial Lawyers of America and the Nevada Trial Lawyers Association, the proposition is tendered that ''the standard of 'conscious disregard of safety procedures in reckless disregard of the possible consequences' is a standard defining 'malice in fact', not 'implied malice' or 'malice in law'. . . .'' The brief concludes that ''[t]here is a very substantial difference between the *animus malus* described by a 'motive and willingness to injure' and a 'deliberate intention to injure'. . . .'' I would be inclined to agree *if* ''motive and willingness to injure'' were in the disjunctive rather than the conjunctive. The reasoning of the case of Davis v. Hearst, 116 P. 530 (Cal. 1911), reveals that use of the conjunctive by that court was not inadvertent or unintended. That is why *Davis* emphasized that ''[i]t is in those cases where the defendant has been guilty of oppression or fraud, or of a malice akin to oppression and fraud, that punitive damages may be awarded.'' *Id.* at 539. The combination of motive *and* willingness to injure admits of no rational definition other than one indicating both an objective or intent, coupled with a willingness, to injure.

gard[ing] known safety procedures," it is apparent that the intent of the majority is to make an end run around all of this court's decisions to the contrary. Unfortunately, rather than forthrightly overruling our past decisions, which have consistently rejected the majority's conjuration of malice in law as a discrete basis for punitive awards in Nevada, the majority in essence pretends that we have always recognized that form of malice as support for imposing exemplary damages. It would therefore appear that despite the unwillingness of the majority to officially pronounce an obituary to virtually every ruling of this court on the subject of punitive damages based upon malice, the net effect is the same.

In an attempt to validate today's ruling, the majority cites both Leslie v. Jones Chemical Co., 92 Nev. 391, 551 P.2d 234 (1976), and Nevada Cement Co. v. Lemler, 89 Nev. 447, 514 P.2d 1180 (1973). Since the majority has not seen fit to acknowledge the actual holdings in either case, it is necessary to again address them lest my silence be viewed as acquiescence.

First, in *Lemler* we observed that:

> appellants seriously contend that because the district judge concluded that the acts of the appellants only amounted to "legal malice and express malice" and not "malice in fact" that the requirements of Gombos v. Ashe [322 P.2d 933 (Cal.App. 1958)] . . . and other California cases, as well as our recent decision in Nevada Credit Rating Bureau, Inc. v. Williams [88 Nev. 601, 503 P.2d 9 (1972)] . . . had not been met. *The record supports a finding of malice in fact.*

*Id.* at 452, 514 P.2d at 1183 (emphasis added). Moreover, the *Lemler* court reaffirmed the position this court had taken in *Nevada Credit Rating Bureau, Inc.* by explaining that:

> NRS 42.010 provides that punitive damages are recoverable where the defendant has been guilty of oppression, fraud or malice expressed or implied. That statute was first enacted in the state of Nevada in 1965 and is verbatim with California Civil Code, Sec. 3294, which was first enacted in 1872 and has not been amended since 1905. *The cases decided in that jurisdiction have interpreted that the malice, contemplated by that section is malice in fact and that the phrase "express or implied" has reference only to the evidence by which malice is established.* Davis v. Hearst, 116 P. 530, 538 (Cal. 1911); Wolfsen v. Hathaway, 198 P.2d 1 (Cal. 1948); Sturges v. Charles L. Harney, Inc., 331 P.2d 1072 (Cal.App. 1958). In Nevada Credit Rating Bureau, Inc. v. Williams, supra, we adopted the applicable principles, as set out in 14 Cal. Jur.2d, Damages § 176.

*Id.* at 451, 514 P.2d at 1182-83 (emphasis supplied, footnote omitted).

In 14 Cal.Jur.2d, Damages § 176, it states:

> An award of exemplary damages, in an action for damages for injuries inflicted by the defendant's malicious act, can be made *only if the plaintiff can show that malice in fact, as distinguished from malice in law, existed with respect to the defendant's act. The distinction between malice in fact and malice in law is substantial.* Malice in fact, or actual malice, denotes ill will on the part of the defendant, or his desire to do harm for the mere satisfaction of doing it. Malice in law, on the other hand, is merely a legal fiction; it is that form of malice which the law presumes, either conclusively or disputably, to exist on the production of certain designated evidence. Malice in fact cannot be presumed; its existence must be found as a fact by the jury, although it may be proved either by direct evidence of declarations, or by an inference drawn from the acts or conduct of the defendant. While the element of malice *which is essential to a recovery of exemplary, or punitive, damages is sometimes called "express malice," "actual malice," "real malice," or "true malice," it is always, in the last analysis, malice of only one kind—the malice of evil motive.*

(Footnotes omitted, emphasis added.) I have burdened the reader with the complete text of the section of 14 Cal.Jur.2d referred to in *Lemler* as having been adopted by this court in order to eliminate any illusions about the accuracy of the majority's assertion. It should be evident to anyone seriously interested in the holding of this court in *Lemler* that at no time did the court recognize implied malice or malice in law as a discrete basis for awarding punitive damages. The most that can be said for *Lemler* and the majority's attempt to expand its holding, is that the decision was most probably improvident based upon the strained adaptation of the law as reaffirmed by this court, to the peculiar facts of that case. In that regard, the reader is invited to review the dissenting opinion of JUSTICE THOMPSON.

The majority also cites to our opinion in Leslie v. Jones Chemical Co., 92 Nev. 391, 551 P.2d 234 (1976), as having recognized implied malice as a basis for awarding punitive damages. Again, the majority avoids the true holding of the opinion as if it didn't exist. After noting that the court was not concerned with the award of compensatory damages, the *Leslie* court stated that "[w]e are here dealing with a remittitur of punitive damages where the evidence *regarding the presence or absence of malice in fact on the part of the defendants is conflicting.*" *Id.* at 393-94,

551 P.2d at 235 (emphasis added). Continuing, the court observed that "[t]he *malice in fact,* if any existed at all, had to be inferred from a disregard of known safety procedures by management personnel of defendants." *Id.* at 394, 551 P.2d at 235 (emphasis added). It is thus seen that even in *Leslie* the court recognized that the only form of malice that would sustain the award of punitive damages was malice in fact. The bottom line in *Leslie* is that this court was unwilling to resolve what it viewed as conflicting evidence concerning the existence of malice in fact, against the perceptions of the trial judge. Again, I invite the reader to peruse the dissent in *Leslie* written by JUSTICE BATJER. In my view, despite the *Leslie* court's adherence to only one form of malice in Nevada law, that of malice in fact, the result reached by the *Leslie* majority is difficult to justify. Having thus concluded, I nevertheless emphasize that the dubious result in *Leslie* provides no support for the majority's attempt to characterize the decision as having recognized malice in law as a legal basis for an award of punitive damages in Nevada. The exact contrary conclusion is uncontradicted in the opinion.

This unwillingness to see, hear, and recognize what this court has been consistently declaring since the 1972 decision in Nevada Credit Rating Bureau, Inc. v. Williams, *supra,* is troubling. My concern is not derived from any particular view or philosophy concerning exemplary damages, but rather the willingness of the majority to so cavalierly pretend that our holdings have been something other than what they are. The plain fact of the matter is that this court has never before recognized in Nevada jurisprudence malice in law as a discrete basis for an award of exemplary damages.

Without reiterating the background laboriously set forth in the plurality opinion in *Craigo,*[3] the serious student of our prior rulings concerning the meaning of the statutory phrase "malice, express or implied," will see that this court has steadfastly adhered to its initial pronouncement in *Nevada Credit Rating Bureau, Inc.* indicating with absolute clarity that the phrase refers only to the evidence by which malice in fact may be proved. The majority's attempt to characterize our prior holdings as archetypes of today's ruling presents a paralogism based upon the tacit assumption that because two of our prior opinions, *Leslie* and *Nevada Cement,* reached results more comfortably within an implied malice rather than an actual malice standard, the former

---

[3]Given the position of the majority in the instant case, it is extremely puzzling how the author of the concurring opinion in *Craigo* could reach a conclusion of no liability for punitive damages there under a standard of malice in law, and reach the opposite conclusion here where there is patently less reason to support a punitive award.

standard was *de facto* adopted despite this court's clear indications to the contrary. I am respectfully unwilling to accord credibility to that method of lawmaking. As stated previously, it appears that the majority's position in the instant case overrules, *sub silentio,* all of our prior rulings concerning awards of punitive damages attributable to malice. I would have much preferred a forthright expression of that result.

If the majority had determined to confront the effect of the instant ruling in overruling our lengthy and consistent line of precedents, there would have been a major challenge in justifying such a result as a legitimate advancement of the common law. In the societal milieu of today, there are many discordant views on the role, propriety, and costs of punitive damages. Courts are ill-equipped to determine social costs and preferences in areas so fraught with controversy and consequences. By way of illustration, I invite the reader to consider the scholarly material contained in 56 S. Cal. L. Rev. (1982) under the general title *Symposium: Punitive Damages.* The referenced material constitutes but a small sampling of the many articles and organized efforts designed to analyze and resolve problems perceived to exist as a result of large and frequent punitive damage awards. Apropos to the point is the majority's simplistic analysis of the Pinto case in Grimshaw v. Ford Motor Co., 119 Cal.App.3d (1981).[4] The majority merely assumes that the *Grimshaw* ruling, allowing huge punitive damages based upon an implied malice standard articulated as "a conscious disregard of the safety of others" is a salutary one. Although I do not find it necessary to characterize or evaluate the *Grimshaw* result, it is interesting and germane to consider a fragment of Professor Dorsey D. Ellis, Jr.'s evaluation on the subject. The professor observed:

> Although expected punitive damage liability may not reflect the social cost of producing small cars, manufacturers must include such potential liability as a production cost, attempt to minimize it, and recover the residue from purchasers. Minimization may entail producing cars that are larger, heavier, less fuel-efficient, and less aesthetically attractive, in order to make them safer. Thus, more resources will be consumed in automobile manufacturing, and the price of cars will be increased to cover these additional costs and the residual cost of expected punitive damage liability. Purchasers will get safer cars, but not by

[4]After this segment of my dissent was prepared, the majority deleted its citation to *Grimshaw* together with attendant comments. I have elected not to modify this dissent accordingly, because the point needs to be stressed that all aspects of the subject should be thoroughly considered and debated before expanding the criteria for punitive awards.

choice. Many automobile purchasers have regularly revealed their preference for small, light, fuel-efficient, aesthetically pleasing, lower-priced, less safe cars. Punitive damage liability will result in more resources being consumed to produce and operate fewer small cars. Prices will be higher, consumers will be limited to purchasing cars that are safer than they desire, net revenues to manufacturers will be lower, and capital will be diverted to other activities. As a consequence, aggregate welfare will be reduced.

Ellis, *Fairness and Efficiency in the Law of Punitive Damages,* 56 S. Cal. L. Rev. 1, 49 (1982).

The economic impact of punitive damages on consumers is but one of the factors that should be objectively and thoroughly considered before expanding the bases upon which punitive damages may be imposed. The prospect of the burden of punitive damages being allocated to consumers at large rather than the entity to be punished is alone sufficient to give pause to the desirability of imposing such damages under a theory of implied malice. Moreover, current efforts to place limits on the amount of punitive awards reflects an awareness that other factors and consequences need to be assessed along with the desirability of punishing certain tortfeasors and products manufacturers. Indeed, our own legislature has proved receptive to such limitations as reflected in the most recent amendment to NRS 42.005. In any event, my concern is not grounded in the philosophy behind exemplary damages or the extent of their availability, but rather the conviction that any proliferation of bases for such damages should be left to the legislative laboratory where extensive debate, study, and research may be considered.[5]

An additional reason why I cannot endorse the majority's decision to disregard *stare decisis* stems from an appreciation of the social benefits derived from the availability of punitive damages based upon desert. I am far from certain where current forces may lead us concerning the future availability of such damages, and fear the possibility of their total demise or severe attenuation unless courts exercise restraint in their imposition. I fully understand that the plaintiff's bar prefers maximizing the availability of unlimited punitive damages, but suggest that it is

[5]In *Craigo,* it was noted as a principle of law, that the judicial gloss placed on the California punitive damages statute borrowed by this state, became part of NRS 42.010 when it was enacted in 1965. Our legislature has never seen fit to change the statute to eliminate the gloss that we have consistently recognized in all of our decisions involving punitive damages based upon malice. Today's majority opinion may have the effect of amending the statute and eliminating the judicial gloss, thereby disregarding the legitimate prerogative of the legislature to amend the statute if it were so inclined.

unrealistic to assume that an eventual day of reckoning will never arrive. The plain truth of the matter is that there are both positives and negatives associated with the imposition of exemplary damages, and if the social costs of such damages are ultimately perceived to be greater than the benefits, the reaction may result in constraints of a counterproductive magnitude. Such an occurrence, I suggest, would be much less likely if the legislature, more attuned to the public pulse, determines the extent to which such damages are available. I possess neither the clairvoyance nor the inclination to assess the social value of the position adopted by the majority. Undoubtedly, reasoned arguments could be marshalled both favorable and antagonistic to today's ruling. I do, however, perceive no principled basis for advancing the common law in Nevada under circumstances where such controversy exists on both sides of the position assumed by the majority.

### Postscript

This is my third written dissent to dispositions prepared by our colleague, JUSTICE SPRINGER, on behalf of the majority in this case. Rather than entirely revising my dissent for a third time, I will simply address here the latest changes in the majority opinion. The only substantive differences between the second majority draft and the third opinion which I am now addressing, are the references to the learned trial judge, The Honorable Jerry Carr Whitehead, and his rulings in the trial below. I do not fault the trial court judge, whose rulings antedated this court's plurality opinion in *Craigo,* for assuming that punitive damages may be assessed under a malice standard identified by "a conscious and deliberate disregard of known safety procedures by management personnel." I do find it curious, however, that the majority would seek to bootstrap its views, post *Craigo,* by referring to a pre-*Craigo* ruling by a trial court who was merely attempting to follow this court's earlier pronouncements. The fact that the majority knows better is underscored by its emphatic reference to *implied* malice in NRS 42.005 as a discrete basis for supporting a punitive award. The majority shares my understanding that "conscious and deliberate disregard of known safety procedures by management personnel" refers to a course of conduct that would support a punitive damage award based only upon implied malice, or malice in law. Indeed, our colleague, JUSTICE SPRINGER, observed in his concurring opinion in *Craigo* that the *Lemler* and *Leslie* cases sustained punitive awards based upon *implied malice.* Referring to *Lemler,* JUSTICE SPRINGER noted that "the defendant cement company had no 'deliberate intention to injure' anyone." *Craigo,* 106 Nev. at 10, 786 P.2d at 28. In characterizing *Leslie,* our colleague stated that "[w]e approved a punitive

award absent even a hint of any 'intention to injure' the plaintiffs." *Id.* Describing "implied malice" as "malice of unintended harm," our colleague concluded that in both the *Lemler* and *Leslie* cases, this court recognized implied malice as a basis for imposing punitive damages. *Id.* For reasons set forth above, and at length in *Craigo,* our colleague is wrong.

*At no time, at least until today,* has this court ever recognized implied malice as a basis for a punitive award.[6] As previously noted, I can understand why the trial judge would have relied upon language in *Lemler* and *Leslie* in reaching his conclusion. Those decisions affirmed punitive awards by tacitly fitting implied malice facts within an express malice legal standard. At least the *Lemler* and *Leslie* courts continued this court's steadfast adherence to the principle that only actual malice would support an award of punitive damages based upon malice. Today's majority simply pretends that our prior rulings do not exist. Interestingly, prior to *Craigo,* neither JUSTICE SPRINGER nor JUSTICE MOWBRAY had dissented from this court's consistent recognition of actual malice as the only form of malice that would support a punitive award in Nevada.[7]

---

[6]The plurality opinion in *Craigo* cited all of our opinions involving punitive damage awards based upon malice. At no time did we recognize malice in law as a basis for exemplary damages. To the contrary, as recognized by JUSTICE GUNDERSON, writing for the court in Kelly Broadcasting v. Sovereign Broadcast, 96 Nev. 188, 606 P.2d 1089 (1980), "[i]n order to award punitive damages, the trial court must find substantial evidence of malice in fact." *Id.* at 194, 606 P.2d at 1093. Moreover, in the opinion of Sanguinetti v. Strecker, 94 Nev. 200, 577 P.2d 404 (1978), authored by JUSTICE MOWBRAY, this court stated:

> Sanguinetti also claims that the court erred in its instruction regarding punitive damages by failing to define *the actual malice required* as "an evil intention to do harm, on the part of the defendant." The argument that this constituted prejudicial error is without merit. There is no reason to believe that the jury understood that *the malice it was to find was in any manner different from this definition.* As noted by this court, legal malice is "a legal fiction; it is that form of malice which the law presumes. . . ." Nevada Credit Rating Bureau, Inc. v. Williams, 88 Nev. 601, 610, 503 P.2d 9, 14 (1972). Without an instruction informing them of it, a jury would have no reason to know of its existence.

*Id.* at 211-12, 577 P.2d at 411-12 (emphasis added). As noted previously, our opinion in *Nevada Credit Rating Bureau, Inc.,* written by JUSTICE BATJER, made it emphatically clear that "[a]n award of exemplary damages, in an action for damages for injuries inflicted by the defendant's malicious act, can be made only if the plaintiff can show that *malice in fact, as distinguished from malice in law,* existed with respect to the defendant's act." *Nevada Credit Rating Bureau, Inc.,* 88 Nev. at 609, 503 P.2d at 14 (quoting from 14 Cal.Jur.2d, Damages § 176) (emphasis added).

[7]In the case of Jeep Corporation v. Murray, 101 Nev. 640, 708 P.2d 297 (1985), the district court judge sitting for JUSTICE MOWBRAY wrote on behalf of the court that " '[m]alice' means [under NRS 42.010, now NRS 42.005]

For the reasons specified above, and with special emphasis on the fact that the record provides no evidentiary basis for imposing punitive damages based upon actual malice, I respectfully dissent.

malice in fact." *Id.* at 650, 708 P.2d at 304. Moreover, we also said (incorrectly) that "malice in fact may be established by a showing that the defendant consciously and deliberately disregarded known safety measures in reckless disregard of the possible results." *Id.* Our colleague Justice Springer participated approvingly in the opinion. It is plainly understood why the district court judge in the instant case ruled as he did. Under the express language of the *Murray* opinion, we stated that our actual malice standard could be met by proof of a conscious and deliberate disregard of known safety measures in reckless disregard of possible consequences. It seems clear that all members of this court now recognize that our pronouncement in *Murray* was incorrect, and that the conscious disregard conduct described therein may support a punitive award based only on an implied malice standard. Judge Whitehead proceeded appropriately under our language in *Murray*. My bewilderment stems from the position taken by the majority in seeking to somehow validate its fantasy regarding implied malice by referring to the ruling of a district court judge who merely followed this court's erroneous pronouncements concerning methods of proving actual malice.