112 F.3d 1052
 97 Cal. Daily Op. Serv. 3240, 97 Daily Journal
D.A.R. 5627
Paula COUGHLIN, Plaintiff-Appellee,
v.
TAILHOOK ASSOCIATION, Defendant,
and
Las Vegas Hilton Corporation; Hilton Hotels Corporation, a
Delaware corporation, Defendants-Appellants.
Paula COUGHLIN, Plaintiff-Appellant,
v.
TAILHOOK ASSOCIATION, Defendant,
and
Las Vegas Hilton Corporation; Hilton Hotels Corporation, a
Delaware corporation, Defendants-Appellees.
 Nos. 95-15909, 95-16024.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 10, 1996.
Decided May 2, 1997.
 
 Larry L. Simms, Gibson, Dunn & Crutcher, Washington, D.C., and Robert C. Bonner, Gibson, Dunn & Crutcher, Los Angeles, California, for defendants-appellants-cross-appellees.
 Dennis A. Schoville and Nancy L. Stagg, Gray Cary Ware & Freidenrich, San Diego, CA, for plaintiff-appellee-cross-appellant.
 Appeals from the United States District Court for the District of Nevada, Philip M. Pro, District Judge, Presiding. D.C. No. CV-93-00044-PMP.
 Before: FLETCHER, WIGGINS, and T. G. NELSON, Circuit Judges.
 WIGGINS, Circuit Judge:
 
 
 1
 During a convention at the Las Vegas Hilton, Navy Lieutenant Paula Coughlin was attacked by a group of men in a hotel hallway outside several convention-related hospitality suites. She sued several defendants, including the hotel and the organization which hosted the convention. A jury awarded her several million dollars in compensatory and punitive damages against the Las Vegas Hilton Corporation ("LVHC") and Hilton Hotels Corporation ("HHC"). This award was subsequently reduced by the district court pursuant to Nev.Rev.Stat. § 42.005(1). LVHC and HHC (collectively, "Hilton") appeal and Coughlin cross-appeals.
 
 
 2
 Coughlin's cross-appeal presents an issue of Nevada law on which there is no controlling precedent of the Nevada Supreme Court. Because we resolve in Coughlin's favor all of the issues raised by Hilton's appeal, we must address Coughlin's cross-appeal. We therefore exercise our discretion to certify to the Nevada Supreme Court the question Coughlin's cross-appeal presents.
 
 I. BACKGROUND
 
 3
 The infamous 1991 Tailhook Convention served as the stage for the despicable event that led to this lawsuit. Hosted by the Tailhook Association ("Association"), the Tailhook Convention was an annual symposium and convention primarily directed at military aviators and held at the Las Vegas Hilton in Las Vegas, Nevada. Navy Lieutenant Paula A. Coughlin, a decorated helicopter pilot, attended the 1991 Tailhook Convention in her capacity as an aide to Rear Admiral John Snyder.
 
 
 4
 After attending a banquet at the Las Vegas Hilton on the evening of Saturday, September 7, 1991, Coughlin returned to her nearby hotel to change out of her military uniform. She then returned to the Las Vegas Hilton to socialize with friends at one of the many convention-related social events at the hotel. Looking for her friends, she entered a third-floor area where several hospitality suites hosted by various Navy squadrons were located. As she started to walk down the hallway-now notoriously known as the "gauntlet"-she was attacked, groped, grabbed, and handled by a throng of men. Fearing she was about to be gang-raped, Coughlin frantically tried to escape. After several minutes, she was eventually able to fight her way into an empty suite.
 
 
 5
 After the attack, Coughlin experienced post-traumatic stress disorder and other psychological problems related to the attack. Although she remained in the Navy for a couple of years, these psychological problems as well as other problems stemming from the attack hampered her ability to perform her duties. Ultimately, she was compelled to resign from the United States Navy.
 
 
 6
 Coughlin brought this action against the Association, HHC, LVHC, and several other Hilton entities.[1] Coughlin's negligence and punitive damages claims survived pre-trial motions against the Association, LVHC, and HHC only. The Association settled with Coughlin for $400,000 just before trial. After a trial lasting several weeks, an eight-person jury found HHC and LVHC negligent and awarded Coughlin compensatory damages of $1,695,000. After bifurcated proceedings mandated by Nevada law, the jury also assessed punitive damages of $2,625,000 against LVHC and $2,325,000 against HHC. Because of Coughlin's settlement with the Association, the district judge subsequently reduced the compensatory damages award by $400,000 to $1,295,000 and also reduced the punitive damages award to $3,885,000 under Nev.Rev.Stat. § 42.005(1).
 
 
 7
 Hilton filed a motion for a new trial on the grounds that one of the empaneled jurors was statutorily disqualified from jury service and had been dishonest during voir dire. After a two-day evidentiary hearing at which the juror testified, the district court denied Hilton's motion. This appeal and cross-appeal followed.
 
 II. STANDARDS OF REVIEW
 
 8
 We review the district court's interpretation of state law de novo. Palmer v. United States, 945 F.2d 1134, 1135 (9th Cir.1991). We review the district court's denial of a motion for a new trial based upon juror misconduct for an abuse of discretion. Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison Indus., Inc., 84 F.3d 1186, 1192 (9th Cir.1996). A district court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the facts. United States v. Rahm, 993 F.2d 1405, 1410 (9th Cir.1993).
 
 III. PUNITIVE DAMAGES
 
 9
 Hilton contends that Coughlin failed to show the requisite "malice in fact" required under Nevada law in order to obtain an award of punitive damages. The Nevada statute under which punitive damages may be obtained by a tort plaintiff provides as follows:
 
 
 10
 ... [I]n an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud or malice, express or implied, the plaintiff, in addition to the compensatory damages, may recover damages for the sake of example and by way of punishing the defendant.
 
 
 11
 Nev.Rev.Stat. § 42.005(1) (1996).
 
 
 12
 The district court concluded that Coughlin had a viable claim for punitive damages because she alleged that the appellants had acted with conscious disregard for known safety standards and measures. Coughlin v. Tailhook Ass'n, Inc., 818 F.Supp. 1366, 1370-71 (D.Nev.1993). Conceding that "if malice in fact is required, the punitive damages claim of Coughlin's Complaint must be dismissed," id. at 1370, the district court concluded that Coughlin's allegations, if proven, indicated implied malice, and her claim of punitive damages remained viable under Nevada law, id. at 1371. We must determine whether the district court correctly interpreted Nevada law.
 
 
 13
 In Granite Constr. Co. v. Rhyne, 107 Nev. 651, 817 P.2d 711 (1991), the Nevada Supreme Court upheld a punitive damages award to a motorist injured when her car struck a wayward bull on an interstate highway. The defendant construction company had failed to honor a provision of its state highway construction contract requiring it to erect a protective fence to prevent livestock from wandering onto the highway. The two-justice plurality held that the "facts show that Granite 'consciously and deliberately disregarded known safety procedures,' safety procedures which Granite expressly agreed to take care of when it signed the highway construction contract." Id. 817 P.2d at 713 (quoting Leslie v. Jones Chem. Co., 92 Nev. 391, 551 P.2d 234, 235 (Nev.1976)). Thus, the plurality held that the trial judge "properly concluded that punitive damages are allowable under such circumstances." Id. The concurring justice[2] agreed with the plurality that a jury finding of conscious and deliberate disregard for known safety procedures could support an award of punitive damages. Id. at 714 (Mowbray, J., concurring).
 
 
 14
 Moreover, in 1995, the Nevada Legislature enacted Nev.Rev.Stat. § 42.001 to define malice for punitive damages purposes in accordance with Granite. Subsection (3) defines "malice, express or implied" as follows: "conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others." Nev.Rev.Stat. § 42.001(3). To the extent this newly-enacted provision says anything about the state of law in 1994 when this case was tried, it indicates that Granite 's definition of "malice, express or implied" was correct.
 
 
 15
 Hilton seeks to avoid the effect of Granite by focusing on a previous Nevada decision. Less than two years before Granite was decided, the Nevada Supreme Court overturned a punitive damages award in Craigo v. Circus-Circus Enters., Inc., 106 Nev. 1, 786 P.2d 22 (1990). In that case, the plaintiff was the victim of an assault and robbery in a casino parking lot. He sued the casino and recovered compensatory and punitive damages. A two-justice plurality, consisting of different justices from that in Granite, essentially read the words "or implied" out of the Nevada punitive damages statute. Id. 786 P.2d at 25-26. Focusing exclusively on "malice in fact," the plurality stated that "it is this court's intention to restrict awards of punitive damages attributable to malice in fact to those extreme cases that convincingly demonstrate conduct motivated by hatred and ill-will and the deliberate intent to injure." Id. at 26. Further, the plurality stated that
 
 
 16
 [w]e disapprove our prior pronouncements that would indicate that malice in fact can be shown by a willful disregard of the rights of others or a conscious disregard of safety measures unless it can be shown that in connection therewith there was a deliberate intention to injure, vex, annoy or harass.
 
 
 17
 Id. at 27.
 
 
 18
 The two-justice plurality was unable, however, to convince a third justice to adopt this position. The concurring justice in Craigo agreed with the plurality's result, but disagreed with the plurality's conclusion that Nevada law limited awards of punitive damages to cases in which the evidence showed the defendant harbored a deliberate intention to injure, vex, annoy, or harass. Id. at 28 (Springer, J., concurring). According to the concurrence, malice required a broader definition than the one offered by the plurality. Id.
 
 
 19
 Since Granite, the Nevada Supreme Court has not returned to the issue of what showing of malice is sufficient to uphold a punitive damages award.[3] We conclude that Granite reflects the current state of Nevada authority on this issue. Three justices in Granite agreed that punitive damages were justified where a jury "found that the defendant consciously and deliberately disregarded known safety procedures-procedures designed to protect the public from serious harm-to save a few dollars." Granite, 817 P.2d at 714 (Mowbray, J., concurring). Craigo 's language limiting punitive damages to cases where the evidence shows malice in fact was not signed by a majority of the Nevada Supreme Court, leaving it with no precedential value. Furthermore, the position of the Craigo plurality was effectively rejected by the Granite majority. Also, section 42.001(3), although enacted after the trial in this case, codified Granite 's definition of malice. Accordingly, we conclude that the district court did not err when it allowed Coughlin's punitive damages claim to proceed to the jury on the theory that the appellants showed a "conscious disregard for the safety of others" amount to implied malice.
 
 IV. HHC'S LIABILITY
 
 20
 Hilton argues that there is no foundation in Nevada law for the judgment awarding punitive damages against the parent corporation HHC. Specifically, Hilton contends that the "agency" theory of punitive damages liability relied upon by the jury as they were instructed by the court has no basis in Nevada law. Hilton argues that Nevada law allows a jury to disregard corporate form only under an "alter ego" theory of liability. Hilton's argument ignores another theory on which the jury was instructed it could award punitive damages against HHC: a finding that HHC itself had acted with conscious disregard for the rights or safety of others. Hilton implicitly assumes that there was insufficient evidence to support this finding. We disagree. Therefore, we need not address whether Nevada law allows an award of punitive damages under an agency theory of liability.
 
 
 21
 The jury was not instructed that HHC could be found liable on Coughlin's punitive damages claim only under an agency theory. Rather, the jury was instructed that LVHC or HHC could be held liable for punitive damages if they found by clear and convincing evidence that the defendant was guilty of malice or oppression. The jury was instructed that "malice" means conduct carried on by a defendant with a conscious disregard for the rights or safety of others, and that "oppression" means subjecting a person to cruel and unjust hardship in conscious disregard of that person's rights. Also, the jury was instructed that a defendant acts with conscious disregard of the rights or safety of others when it is aware of the probable dangerous consequences of its conduct and willfully and deliberately fails to avoid those consequences.
 
 
 22
 Hilton does not challenge the jury instructions on Coughlin's punitive damages claim. Therefore, we must affirm the jury's finding that HHC acted with a conscious disregard for the rights and safety of others if there is substantial evidence to support such a finding. See Maynard v. City of San Jose, 37 F.3d 1396, 1404 (9th Cir.1994). "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." Id.
 
 
 23
 Our review of the record reveals substantial evidence that supports the jury's finding that HHC acted with a conscious disregard for the rights or safety of hotel guests. Testimony established that HHC's security personnel oversaw the details of LVHC's security operations, performing audits and inspections. In fact, LVHC's director of security reported to HHC management. Other testimony showed that HHC's President, Barron Hilton, had a special relationship with Tailhook. An LVHC employee testified that as a result of this special relationship, he was instructed to "let [Tailhook convention attendees] have their fun." Barron Hilton himself testified that he knew the Tailhook group was "boisterous."
 
 
 24
 Together with the evidence establishing HHC's oversight of LVHC's security operations, the jury could have inferred that HHC knew about the dangers created by allowing the Tailhook convention to proceed unfettered in the third-floor area. Evidence established that LVHC knew about convention-related assaults in the hallways outside the hospitality suites as early as 1988. The jury saw reports from LVHC security guards reporting a "gauntlet" attack on an 18-year old woman that left her half-naked. Nevertheless, the evidence indicated that HHC's management took inadequate steps to ensure the safety of Hilton guests such as Coughlin in the third-floor area during the 1991 Tailhook Convention.
 
 
 25
 Although this evidence is not by any means overwhelming, we believe it is sufficient to support the jury's finding that HHC was guilty of malice or oppression and thus subject to an award of punitive damages. We conclude that this evidence is sufficient for a reasonable jury to conclude that HHC was aware of the probable dangerous consequences of its conduct and willfully and deliberately failed to avoid those consequences. Thus, we uphold the jury's finding that HHC acted with conscious disregard for the rights or safety of others.
 
 V. JUROR MISCONDUCT
 
 26
 After the verdicts, Hilton unsuccessfully moved for a new trial premised upon the misconduct of juror Cory Weinper. Hilton now contends that Weinper's participation in the verdict mandates reversal of the district court's judgment. We perceive two separate theories advanced by Hilton: (1) that Weinper is a convicted felon and thus statutorily disqualified from serving on a federal jury; and (2) that Weinper repeatedly lied to the district judge during voir dire, failing to reveal several matters that would have given rise to a challenge for cause. We address each theory separately.
 
 A. Participation of a Felon-Juror
 
 27
 In 1974, Weinper was convicted in California on a marijuana possession charge. The statute under which Weinper was found guilty provided as follows: "Every person who possesses any marijuana ... shall be punished by imprisonment in county jail for a period of not more than one year or the state prison for a period of not less than one year or more than 10 years." See Cal. Health & Safety Code § 11357(a) (1973), amended by Cal. Health & Safety Code § 11357 (1991).
 
 
 28
 When called for jury service, Weinper filled out the standard juror qualification questionnaire used by the district court clerk's office in Nevada. Question 6 of this form asked "[h]ave you ever been convicted, either by your guilty or nolo contendere plea or by a court or jury trial, of a state or federal crime for which punishment could have been more than one year in prison?"[4] Weinper checked the box marked "NO." This answer was incorrect; under the statute in effect in 1974, Weinper could have been sentenced to more than one year in prison as a result of his guilty plea to the marijuana possession charge. But because he answered no, he was called for jury service. Neither the parties nor the district court raised Weinper's 1974 drug conviction until after the trial's completion.
 
 
 29
 Federal law directs the chief judge of each district court to set up a system to determine whether each person called for jury service is qualified to serve as a juror. 28 U.S.C. § 1865(a). A person is unqualified if, inter alia, he or she "has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored." Id. § 1865(b)(5). The statute also provides a method for litigants to challenge the jury selection process. Id. § 1867(c).
 
 
 30
 Remarkably, however, little authority governs the situation presented here, where a statutorily disqualified juror slipped through the juror selection process and sat on a jury that rendered a verdict. The statutes discussed above are not helpful because they do not say anything about how this situation should be resolved. Two circuit court cases have faced a similar issue previously. In United States v. Boney, 977 F.2d 624 (D.C.Cir.1992) ("Boney I "), the D.C. Circuit declined to order a new trial where the defendant discovered after conviction that one of the jurors was a felon. The court concluded that the Sixth Amendment right to an impartial jury "does not require an absolute bar on felon-jurors." Id. at 633. The court did, however, remand the case to the district court with instructions to hold an evidentiary hearing to determine whether the juror's failure to disclose his felon status resulted in "actual bias" to the defendant. Id. at 634-35. On remand, the district court held an evidentiary hearing at which the felon-juror testified, but the district court did not permit defense counsel to cross-examine the juror or call the other jurors to testify. As a result, when the defendant re-appealed the district court's ruling that the felon-juror's participation did not result in actual bias, the D.C. Circuit remanded the case a second time for a further evidentiary hearing. United States v. Boney, 68 F.3d 497, 503 (D.C.Cir.1995) ("Boney II ").
 
 
 31
 In United States v. Humphreys, 982 F.2d 254 (8th Cir.1992), the Eighth Circuit held that no new trial was required where an embezzler sat on a jury which convicted the defendant of income tax evasion. The felon-juror revealed his prior conviction during voir dire but mistakenly indicated that his civil rights had been restored. The defendant moved for a new trial based on the felon-juror's participation in the verdict. The court held that a defendant presenting such a post-verdict challenge had to demonstrate actual bias or prejudice affecting the juror's impartiality and the fairness of the trial. Id. at 261.
 
 
 32
 We agree with Boney I and Humphreys that the participation of a felon-juror is not an automatic basis for a new trial. We also agree with Boney I and Humphreys that the participation of a felon-juror can be the basis for a new trial if the juror's participation in the case results in "actual bias" to one or more of the parties. Here, however, despite having the opportunity to examine Weinper on the witness stand during a two-day evidentiary hearing on their motion for a new trial, Hilton has failed to present even a shred of evidence suggesting that Weinper's 1974 drug conviction created actual bias or prejudice affecting his ability to analyze this case in an impartial fashion. Hilton relies on Weinper's participation alone as grounds for a new trial. Without a showing of actual bias or prejudice, we reject Hilton's position.
 
 B. Dishonesty on Voir Dire
 
 33
 More troubling is the problem presented by Weinper's answers (or, more accurately, non-answers) to the district court's voir dire questions. Because of the nature of this case, the district court asked the potential jurors various questions intended to solicit information about their past contact with the judicial system and their own experiences with physical and/or sexual assault. As Hilton demonstrated at the post-trial evidentiary hearing, Weinper failed to disclose a number of previous misdemeanor convictions, involvement in at least one civil proceeding, and instances of domestic violence. Although we are troubled by Weinper's failure to disclose these items to the district court, we conclude that Hilton suffered no actual bias in those instances where the record shows Weinper was dishonest rather than simply mistaken as to the district court's questions. As a result, we conclude that no new trial is necessary.
 
 
 34
 1. The District Court's Questions and Weinper's Answers
 
 
 35
 After soliciting proposed questions from counsel for all parties, the district judge asked a variety of questions to prospective jurors during voir dire. Among these questions was the following:
 
 
 36
 Now, have you, or to your knowledge, any members of your family, ever been involved in a civil or criminal case as either a party to that case or a witness to that case? Any of you ever been a plaintiff or a defendant in a lawsuit, or called to testify as a witness at a trial of any kind, or a court hearing of any kind? If so, please raise your hand.
 
 
 37
 Weinper apparently raised his hand, because the district judge called on him after questioning two other prospective jurors. Weinper then disclosed that he had been the plaintiff in a personal injury lawsuit arising out of a car accident. He told the court that the case was filed in California in 1988 and was resolved after a trial.
 
 
 38
 Next, the district judge asked the following:
 
 
 39
 Now, if not an actual lawsuit, have any members of the prospective jury, the 14 of you, or to your knowledge, members of your immediate family, ever made a claim for personal injury, maybe one which did not end up going to a lawsuit, but otherwise a claim for injuries you might have sustained? If so, would you raise your hand.
 
 
 40
 Weinper did not respond to this question. Later, because the case involved an alleged assault, the district judge asked the following series of questions:
 
 
 41
 Have any of you, or to your knowledge, any members of your family, ever been physically or sexually assaulted or molested?
 
 
 42
 Have any of you, or anyone you know, ever been accused of physical or sexual assault, or of sexual harassment, or have any of you, or anyone you know, ever made a claim regarding physical or sexual assault or sexual harassment against some other individual?Have any of you ever personally witnessed an incident involving a physical or sexual assault on another individual?
 
 
 43
 Again, Weinper did not respond.
 
 
 44
 At the evidentiary hearing on their motion for a new trial, Hilton established the following:
 
 
 45
 (1) In 1993, Weinper's mother obtained a temporary protective order against him due to domestic violence.
 
 
 46
 (2) In 1993, Weinper was convicted of cocaine possession and sentenced to six months probation.
 
 
 47
 (3) In 1992, Weinper filed a lawsuit against a taxicab driver and a taxicab company for injuries suffered when the driver allegedly stabbed him in an altercation.
 
 
 48
 (4) In 1992, Weinper pled guilty to a misdemeanor drug possession charge. He received a suspended sentence and probation.
 
 
 49
 (5) In 1991, Weinper pled guilty to a misdemeanor drug possession charge and was fined $250.00.
 
 
 50
 (6) In 1989, Weinper filed a civil lawsuit in Nevada alleging that another driver had rear-ended his automobile.
 
 
 51
 (7) In 1974, Weinper pled guilty to a drug possession charge in California. He received probation.
 
 
 52
 Relying on this evidence, Hilton contends Weinper was dishonest in responding to the district court's questions asking whether the prospective jurors had been a party or a witness in a civil or criminal case, whether any prospective juror had ever filed any claim for personal injury, and whether any prospective juror had ever been physically or sexually assaulted or been accused of physical or sexual assault. In addition to these failures, Hilton also contends the record shows that Weinper lied about other things during voir dire and during his testimony at the new trial evidentiary hearing. Without going into detail, these lies include the following: (1) misrepresentations about possession of a pilot's license and flight experience; (2) misrepresentations about home ownership; and (3) misrepresentations about ownership of a business.
 
 
 53
 During his testimony at the evidentiary hearing, Weinper offered explanations for his failure to disclose completely his criminal and civil litigation history during voir dire. First, Weinper explained that he had not revealed to the court his criminal history because the question about lawsuits was "twofold" and "it never crossed [his] mind" to reveal his criminal history. In his testimony at the evidentiary hearing, Weinper explained that "I wasn't consciously thinking about criminal cases." Similarly, Weinper explained that he did not reveal his involvement in various domestic abuse cases or the taxicab altercation because he thought the question was directed at sexual assaults because of the nature of the case. Weinper also explained his failure to disclose his other automobile accident case by claiming that he thought the question only related to proceedings in which he had been a witness. "[W]hat I was thinking about was testifying as a witness in a formal trial.... [M]entally it didn't register." Finally, Weinper explained that he failed to disclose the civil case arising out of the taxicab altercation because "it never crossed [his] mind."
 
 
 54
 Although dubious of Weinper's explanations, the district judge ultimately concluded that these explanations were "plausible and consistent."
 
 
 55
 Given Juror Weinper's explanation that he perceived the Court's questions as calling for responses to criminal and civil litigation in which he had testified at a formal hearing, his disclosure of the 1988 civil lawsuit is plausible and his omission of other cases consistent. Similarly, Weinper's testimony that he was focused during jury selection on the issue of sexual assault versus physical assault when answering the Court's voir dire questions is equally plausible given the nature of the case brought by Plaintiff Coughlin as it was outlined by the Court minutes earlier in the jury selection process.
 
 
 56
 This analysis led to the district court's ultimate conclusion: "On balance, the Court finds that Juror Weinper misunderstood some of the Court's voir dire questions. The Court does not, however, find that Juror Weinper failed to honestly answer material questions on voir dire."
 
 2. Legal Standard
 
 57
 In McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), the United States Supreme Court addressed a claim for a new trial due to a juror's failure to answer honestly the court's voir dire questions. In that products liability case, the juror failed to reveal that his son had been injured as the result of an exploding tire even though the trial court asked whether any prospective juror or juror's family member had suffered a severe injury as the result of an accident at home. Rejecting the argument for a new trial, the Court recognized that it was nearly impossible to give each litigant a trial free from any error. Id. at 553, 104 S.Ct. at 848-49. Thus, the Court reversed the lower court's ruling that the juror's failure to disclose his son's accident required a new trial. In so doing the Court adopted the following test: "We hold that to obtain a new trial in such a situation, a party must first demonstrate that a jury failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." Id. at 556, 104 S.Ct. at 850.
 
 
 58
 We recently clarified McDonough 's holding in United States v. Edmond, 43 F.3d 472 (9th Cir.1994). In that armed robbery case, an empaneled juror failed to reveal that he had been an armed robbery victim some years earlier. After an evidentiary hearing, the district court ordered a new trial, even though it concluded that the juror had simply forgotten about the experience. We reversed, holding that "the district court abused its discretion when it concluded that [the juror]'s simple forgetfulness fell within the scope of dishonesty as defined by McDonough." Id. at 474.
 
 3. Application
 
 59
 Relying on Edmond and McDonough, the district court concluded that Weinper's responses to the voir dire questions were mistaken but honest. Therefore, it concluded that Hilton had failed to meet the first part of the McDonough test. Additionally, the district court also stated that it was not persuaded that correct responses to its questions would have served as the basis for a challenge for cause. Relying on Weinper's statement that he knew of no reason why he could not render a verdict based solely on the evidence and the court's instructions, the court concluded there was no evidence that Weinper was actually biased. Although our reasoning differs slightly, we agree with the district court's conclusion.
 
 
 60
 Even under a deferential clearly erroneous standard, we are not prepared to endorse the district judge's conclusion that Weinper's responses to the court's voir dire questions were entirely honest. However, we are convinced that any dishonesty by Weinper was related to non-material, collateral matters. Weinper's failure to disclose his misdemeanor drug convictions, for instance, did not result in any bias or prejudice to Hilton. Similarly, Weinper's failure to disclose the 1989 lawsuit arising out of an auto accident is not the source of any bias or prejudice to Hilton. Finally, any dishonesty in Weinper's statements regarding his flight experience or his ownership of a home is clearly related to matters that are not material to the instant case. Thus, to the extent Weinper was dishonest in his answers during voir dire and in his testimony during the evidentiary hearing, any such dishonesty was not related to a material question.
 
 
 61
 Weinper's failure to disclose his involvement in physical altercations is more troubling. Here, however, Weinper's explanation that he was mistaken as to the scope of the district judge's question is convincing. The district judge's phrasing of the question-"physically or sexually assaulted or molested ... physical or sexual assault or sexual harassment"-could be understood as placing an emphasis on sexually-related violence. Weinper explained that he did not disclose the taxicab altercation or his domestic abuse problems because he thought the question was directed at sexual assaults. Given the question's emphasis, we cannot conclude that the district court's acceptance of Weinper's explanation was clearly erroneous.
 
 
 62
 Weinper's failure to disclose his 1992 lawsuit against the taxicab company is also troubling. Clearly, Weinper should have disclosed this lawsuit in response to the district court's question about involvement in civil or criminal cases. He did not. He explained that he thought the question was limited to cases that went to trial, or cases where he had actually testified. As a result, the taxicab lawsuit "never crossed [his] mind." The district court accepted this explanation, finding that it was "plausible and ... consistent." Although it is a close question, we cannot conclude that the district court clearly erred.
 
 
 63
 Thus, the district judge did not clearly err when he concluded that Weinper did not fail to answer honestly material questions on voir dire. We conclude that Weinper's dishonesty, if any, was limited to collateral matters that had no impact on his ability to serve as a juror in this proceeding. Accordingly, Hilton's argument for a new trial under McDonough fails.
 
 4. Implied Bias
 
 64
 Even where a juror's answers are entirely honest, however, a new trial may be warranted under an "implied bias" theory. See McDonough, 464 U.S. at 556-57, 104 S.Ct. at 850 (Blackmun, J., concurring) ("[R]egardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias, or, in exceptional circumstances, that the facts are such that bias is to be inferred."); id. at 558-59, 104 S.Ct. at 851 (Brennan, J., concurring) ("I therefore cannot agree with the Court when it asserts that a new trial is not warranted whenever a prospective juror provides an honest answer to the question posed."). Implied bias can serve as the basis for a new trial in "extraordinary" or "extreme" circumstances. See Smith v. Phillips, 455 U.S. 209, 222, 102 S.Ct. 940, 948-49, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring).
 
 
 65
 In Tinsley v. Borg, 895 F.2d 520 (9th Cir.1990), we discussed four general fact situations where bias might be presumed or implied: (1) "where the juror is apprised of such prejudicial information about the defendant that the court deems it highly unlikely that he can exercise independent judgment even if the juror states he will," id. at 528; (2) "[t]he existence of certain relationships between the juror and the defendant," id.; (3) "where a juror or his close relatives have been personally involved in a situation involving a similar fact pattern," id.; and (4) "where it is revealed 'that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial ... or that the juror was a witness or somehow involved in the [underlying] transaction,' " id. (quoting Phillips, 455 U.S. at 222, 102 S.Ct. at 948 (O'Connor, J., concurring)). Although bias may be presumed or implied in other factual contexts as well, these general categories are "instructive." Id.
 
 
 66
 Hilton's allegation that Weinper is somehow biased falls into none of these four general categories. Hilton does not contend that Weinper had some pre-trial knowledge about the facts underlying this lawsuit, and Hilton does not contend that Weinper was somehow related to Coughlin, Hilton, or a witness in this case. Although Weinper's taxicab altercation in 1992 led to a lawsuit based on a somewhat analogous legal theory (respondeat superior ), the facts of that case are significantly different from the facts underlying this dispute between Coughlin and Hilton. Little of the trial testimony in this case focused on the actual attack on Paula Coughlin; most of the witnesses were Hilton employees who did not witness the attack.
 
 
 67
 As a result, we conclude that there are no "extraordinary" or "extreme" circumstances in this case that require a new trial because of Weinper's implied bias. Although the record shows that Weinper was a drug user with an extensive background of civil and criminal litigation, nothing in the record indicates that Weinper was presumptively biased against Hilton or in favor of Coughlin. Although Weinper's participation in the jury verdict in this case can safely be called unfortunate, it does not warrant a new trial. We therefore affirm the verdict and judgment in Coughlin's favor.VI. NEVADA'S CAP ON PUNITIVE DAMAGES
 
 
 68
 Because we reject Hilton's efforts to have the jury verdict overturned, we must turn to the issue presented by Coughlin's cross-appeal. Nev.Rev.Stat. § 42.005 places a limitation on the amount of punitive damages that may be awarded to a plaintiff. The statute provides as follows:
 
 
 69
 Except as otherwise provided in this section or by specific statute, an award of exemplary or punitive damages made pursuant to this section may not exceed:
 
 
 70
 (a) Three times the amount of compensatory damages awarded to the plaintiff if the amount of compensatory damages is $100,000 or more; or
 
 
 71
 (b) Three hundred thousand dollars if the amount of compensatory damages awarded to the plaintiff is less than $100,000.
 
 
 72
 Nev.Rev.Stat. § 42.005(1).
 
 
 73
 The district court concluded that the $400,000 Association settlement should be subtracted from Coughlin's $1,695,000 compensatory damages award before the application of Nevada's punitive damages cap. Thus, the district court concluded that the appellants' punitive damages liability was capped by section 42.005(1) at three times that amount, or $3,885,000. The district court reduced Coughlin's award accordingly. In her cross-appeal, Coughlin argues that the district court erroneously interpreted section 42.005(1).
 
 
 74
 We conclude that a question of Nevada law is determinative of Hilton's punitive damages liability. We further conclude that it appears there is no controlling precedent in the decisions of the Nevada Supreme Court on this issue. In such a circumstance, we may in our discretion exercise our authority to certify the question to the Nevada Supreme Court. See Alaska Airlines, Inc. v. United Airlines, Inc., 902 F.2d 1400, 1405 (9th Cir.1990). Accordingly, we certify the following question to the Nevada Supreme Court: Should the limitation of Nev.Rev.Stat. § 42.005(1) be computed on the amount of compensatory damages awarded by the jury or that amount less any amount received from a settling defendant?
 
 
 75
 We respectfully request the Nevada Supreme Court to exercise its discretionary authority under Nevada Rule of Appellate Procedure 5 to accept and decide this question. Our phrasing of the question should not restrict the court's consideration of the problems and issues involved. If the Nevada Supreme Court declines certification, we will resolve the issues according to our perception of Nevada law.
 
 
 76
 The Clerk will file a certified copy of our opinion and order with the Nevada Supreme Court pursuant to Nevada Rule of Appellate Procedure 5. This panel retains jurisdiction over further proceedings in this Court. Because we affirm the verdict and judgment in Coughlin's favor, she may execute her damages award to the extent of the district court's judgment. If the Nevada Supreme Court responds that the punitive damages cap should be computed based on the amount of compensatory damages awarded by the jury, we will remand the case to the district court with instructions to enter a supplemental damages award.
 
 
 77
 The parties shall notify the Clerk within one week after the Nevada Supreme Court accepts or rejects certification, and again within one week if and when that court renders an opinion.
 
 VII. DISPOSITION
 
 78
 The verdict and judgment in Coughlin's favor is AFFIRMED. Coughlin may execute her damage award to the extent of the district court's judgment. We CERTIFY the question presented by Coughlin's cross-appeal to the Nevada Supreme Court.
 
 
 
 [1]
 LVHC owns the Las Vegas Hilton. LVHC is a privately-held corporation owned entirely by HHC
 
 
 [2]
 The Nevada Supreme Court has five justices
 
 
 [3]
 Hilton's reliance on Snyder v. Viani, 110 Nev. 1339, 885 P.2d 610 (1994), cert. denied, --- U.S. ----, 117 S.Ct. 385, 136 L.Ed.2d 302 (1996), is misplaced. Snyder involved an action brought by the estate of a young man killed in an automobile accident after he ingested several alcoholic beverages in a tavern. Id. 885 P.2d at 611. Snyder cited and discussed Craigo as follows:
 Further, Snyder's allegations that respondents acted with "malice" do not set forth any right to relief. A plurality of this court has previously defined "malice," in the context of our punitive damages statute (NRS 42.010), as "hatred and ill-will and the deliberate intent to injure." Craigo v. Circus-Circus Enterprises, 106 Nev. 1, 9, 786 P.2d 22, 26 (1990). Here, Snyder has alleged no facts suggesting that any of the defendants acted with ill-will or a deliberate intent to injure Lovett.... We therefore affirm the district court's order granting respondents' motion to dismiss.
 Id. at 613. Hilton asserts that Snyder 's discussion of Craigo "represents the authoritative statement of Nevada law on punitive damages." We disagree. Although Snyder does embrace the Craigo plurality's definition of "malice," it does not dismiss a claim for punitive damages. Furthermore, we note that the Snyder dissent, signed by two justices who were on opposite sides of the decision in Granite, makes no mention of punitive damages, Granite, or Craigo. Thus, we conclude that Snyder 's tangential statement does not reverse the court's clear holding in Granite.
 
 
 [4]
 The questionnaire included instructions for each question. The instruction for question 6 told the potential juror that "[o]ne is disqualified from jury service only for criminal offenses punishable by imprisonment for more than one year, but it is the maximum penalty, not the actual sentence which controls."