# Supreme Court of Florida

————————

No. SC13-244
————————

**LUCIOUS BOYD,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

————————

No. SC13-1959
————————

**LUCIOUS BOYD,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[December 17, 2015]

PER CURIAM.

Lucious Boyd appeals a final order of the circuit court denying his motion to

vacate his conviction of first-degree murder and sentence of death filed under

Florida Rule of Criminal Procedure 3.851. Boyd also petitions this Court for a writ

of habeas corpus.  We have jurisdiction.  See art. V, § 3(b)(1), (9), Fla. Const.  For

the reasons discussed below, we affirm the circuit court's denial of Boyd's rule

3.851 motion and deny relief on his petition for writ of habeas corpus.

## I.  BACKGROUND AND FACTS

Lucious Boyd was convicted for the first-degree murder, armed kidnapping,

and sexual battery of Dawnia Dacosta and sentenced to the penalties of death, life

imprisonment, and fifteen years' imprisonment, respectively.  Boyd v. State, 910

So. 2d 167, 176-77 (Fla. 2005).

## A.  Trial and Direct Appeal Proceedings

On direct appeal, we set forth the relevant factual and procedural

background as follows:

> The evidence presented at trial revealed the following facts.  In
> the early morning hours of December 5, 1998, Dawnia Dacosta's car
> ran out of gas while she was on her way to her home in Deerfield
> Beach, Florida, from a midnight church service.  She had just exited
> from Interstate 95 (I–95) onto Hillsboro Beach Boulevard and pulled
> onto the shoulder.  She then took a red gas can she kept in her car,
> walked about a block east to a nearby Texaco gas station, and bought
> a gallon of gas.  At approximately 2 a.m., during the time she was at
> the gas station, Dacosta spoke with two other customers, Lisa Bell and
> Johnnie Mae Harris.  She asked Bell for a ride back to her car, but
> Bell had walked to the station and so could not give Dacosta a ride.
> Bell and Harris then watched Dacosta speak with a black male in a
> van in the station's parking lot.  Harris asked the man if he was going
> to help Dacosta, and the man nodded, indicating yes.  Bell later told
> the police that the van she saw was greenish-blue in color, while
> Harris said that she thought the van was burgundy.  Though somewhat
> unsure about the van's color, Harris was certain that she saw the word

"Hope" on its side.  In a photo lineup and at trial, Harris identified the man she saw in the van that night as Lucious Boyd.

Boyd spent the evening of December 4 with Geneva Lewis, his girlfriend, at her mother's home.  Boyd left the house around 10 or 11 p.m., and Lewis did not see him again until the morning of December 5, at around 9 or 10 a.m.  Lewis testified that on December 4 and 5, Boyd was driving a green church van with writing on its side and that the van belonged to Reverend Frank Lloyd of the Hope Outreach Ministry Church, for whom Boyd performed occasional maintenance work.

Dacosta's family began searching for her after she did not return home on December 5.  They found her car at an I–95 exit and began circulating fliers with Dacosta's photograph, indicating that she was missing, throughout the area.  Bell and Harris saw the fliers, recognized Dacosta as the woman with the gas can at the Texaco station on December 5, and contacted the police with their information.

On December 7, Dacosta's body was discovered in an alley behind a warehouse on 42nd Street in Deerfield Beach.  The body was wrapped in a shower curtain liner, a brown, flat bed sheet, and a yellow, flat bed sheet.  A purple duffel bag and two large black trash bags covered her head.  It was determined that she had been dead for between thirty-six and seventy-two hours.

At trial, it was stipulated that Dacosta died due to a penetrating head wound and that the bruising on her head was consistent with but not exclusive to the face plate of a reciprocating saw.  Wounds to her chest, arms, and head were consistent with but not exclusive to a Torx brand torque screwdriver, and she had defensive wounds on her arms and hands.  There was bruising to her vagina that was consistent with sexual intercourse, although the medical examiner could not determine whether the intercourse was consensual or nonconsensual.  Dacosta had thirty-six superficial wounds on her chest, four on the right side of her head, and twelve on her right hand, some being consistent with defensive wounds and some being consistent with bite marks.  One fatal wound to the head perforated the skull and penetrated Dacosta's brain.

On March 17, 1999, while Detectives Bukata and Kaminsky of the Broward County Sheriff's Office were investigating another crime unrelated to Dacosta's death, they saw a green van in the Hope Outreach Ministry Church parking lot.  The van had burgundy writing

on it that read "Here's Hope."  Bell would later identify the church's van as the same van she had seen on the morning of December 5 at the Texaco station.  The detectives decided to investigate, and their inquiries as to the owner of the van led them to Reverend Lloyd.  When the detectives questioned Lloyd about the location of the van on the night of December 4, Lloyd's secretary, who was present at the questioning, remarked that Lucious Boyd had driven the van on that weekend.  On December 4, Boyd had taken Reverend Lloyd to pick up a rental car in the church's green 1994 Ford van.  Reverend Lloyd further testified that he instructed Boyd to take the van back to the church but that Boyd did not return the van until Monday, December 7.  Reverend Lloyd also stated that when he left the van with Boyd, various tools owned by the church, including a set of Torx brand screwdrivers and a reciprocating saw, were in the van, as well as a purple laundry bag that the pastor used to deliver his laundry to the cleaners.  When Reverend Lloyd returned on December 15, he discovered that the screwdrivers, the saw, and the laundry bag were missing.

Boyd was arrested for Dacosta's murder on March 26, 1999.  Seminal fluid taken from Dacosta's inner thigh matched the DNA profile of Boyd.  Tests also did not eliminate Boyd as a match for a hair found on Dacosta's chest.  A DNA profile consistent with Boyd's was found in material taken from under Dacosta's fingernails.  In addition, fingerprints taken from the trash bag found around the victim's head matched fingerprints of Boyd's girlfriend, Geneva Lewis, and her son, Zeffrey Lewis.  Tire marks on a sheet covering the victim's body were consistent with the tires on the church van, although trial expert Terrell Kingery, a senior crime laboratory analyst for the Orlando Regional Crime Laboratory, testified that he could not say for certain that the van's tires made the marks because over 1.5 million tires could have made the tracks on the sheet.  Dr. Steven Rifkin, a private dentist and a forensic odontologist with the Broward County Medical Examiner's Office, testified that bite marks on Dacosta's arm were, within a reasonable degree of certainty, made by Boyd's teeth.

On April 1, Detective Bukata obtained a warrant to search the apartment of Boyd and Lewis, which was a block east of the Texaco station.  Detective Bukata arrived at the apartment and told Lewis to leave with her children for a few days so that the officers could fully search the apartment.  The investigators found blood at various

locations throughout the apartment. Blood found on the underside of the carpet and on the armoire matched Dacosta's DNA profile. The shower curtain rings were unsnapped, and there was no liner to the shower curtain. Carpet fibers taken from the yellow sheet in which Dacosta's body was wrapped matched characteristics of carpet samples taken from Boyd's apartment.

Lewis had previously lived with Boyd at his apartment but had moved out in October of 1998. While living with Boyd, Lewis had purchased a queen-size bed, which she left at the apartment when she moved. Lewis and her three children moved back in with Boyd in February of 1999 and discovered that the bed was no longer at Boyd's apartment. When she asked about it, Boyd told her that he had given it away but would get it back. When she inquired about it again, Boyd told her that she would not want that bed and that he would get her another one. Lewis also identified the flat bed sheets, one brown and one a "loud yellow," that were found around Dacosta's body as similar to ones she had owned while living at Boyd's apartment but that she no longer knew where they were or if they were at Boyd's apartment or at her mother's home.

A jury convicted Boyd of first-degree murder, sexual battery, and armed kidnapping. The trial court subsequently conducted a penalty phase proceeding, during which both sides presented evidence. The jury unanimously recommended that Boyd be sentenced to death. The trial court followed the jury's recommendation and imposed a death sentence, finding and weighing two aggravating factors, one statutory mitigating factor, and five nonstatutory mitigating factors. State v. Boyd, No. 99–5809 (Fla. 17th Cir. Ct. order filed June 21, 2002) (sentencing order). The trial court also sentenced Boyd to fifteen years' imprisonment for the sexual battery and to life imprisonment for the armed kidnapping charges.

Id. at 174-77 (footnotes omitted). This Court affirmed Boyd's convictions and

sentence of death. Id. at 194.

### B. Postconviction Relief Proceedings

On February 14, 2007, Boyd filed a Motion to Vacate Judgment of Conviction and Sentences with Special Request for Leave to Amend, pursuant to Florida Rule of Criminal Procedure 3.851. He raised the following claims: (1) denial of access to public records; (2) violation of his rights of due process and equal protection by failing to apply rule 3.851; (3) counsel was ineffective by failing to adequately conduct voir dire, challenge the admissibility of forensic evidence pursuant to Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), and utilize forensic experts; (4) juror misconduct; (5) denial of adversarial testing during the sentencing phase, including counsel's ineffectiveness for failure to move for a mistrial based on inflammatory and prejudicial comments; (6) denial of rights under Ake v. Oklahoma, 470 U.S. 68 (1985); (7) denial of the right to interview jurors; (8) cumulative error; and (9) the unconstitutionality of Florida's lethal injection statute and procedure.

On May 29, 2009, Boyd filed an amended motion to vacate his convictions and sentences, adding claims that newly discovered evidence undermined the reliance of the forensic evidence used to convict and sentence, and that the State committed a Brady[1] violation. Boyd subsequently filed a second amended rule 3.851 motion on March 23, 2012.

---

1. Brady v. Maryland, 373 U.S. 83 (1963).

On June 5, 2012, the circuit court granted an evidentiary hearing on some of Boyd's claims. On August 28 and 29, 2012, the circuit court held an evidentiary hearing on Boyd's claims of ineffective assistance of counsel for failure to conduct adequate voir dire concerning jurors' prior criminal histories, juror misconduct, and ineffective assistance of penalty phase counsel for failure to move for a mistrial based on inflammatory and prejudicial comments. In a sixty-two page order, dated January 2, 2013, the circuit court denied these three claims and summarily denied Boyd's remaining claims. Boyd now appeals the lower court's order denying postconviction relief and also petitions for a writ of habeas corpus.

## II. POSTCONVICTION RELIEF CLAIMS

### A. Actual Juror Bias Claims

Boyd asserts that he is entitled to a new trial because two jurors failed to disclose information pertinent to his decision to retain them for jury service, thereby denying him a fair and impartial jury. The present appellate claim involves issues of fact considered and conclusions of law made by the circuit court. This Court employs a mixed standard in reviewing a postconviction court's denial of postconviction relief, "deferring to the postconviction court's factual findings that are supported by competent, substantial evidence, but reviewing legal conclusions de novo." Victorino v. State, 127 So. 3d 478, 486 (Fla. 2013) (citing Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004)); Jackson v. State, 127 So. 3d

- 7 -

447, 460 (Fla. 2013) ("This Court accords deference to the postconviction court's factual findings following its denial of a claim after an evidentiary hearing.").

Boyd argues that jurors Tonja Striggles and Kevin Rebstock failed to disclose information concerning their criminal histories, which denied Boyd a fair and impartial jury at trial. According to Boyd, the presence of Juror Striggles and Juror Rebstock—one, a convicted felon who had not timely had her civil rights restored; the other, a former misdemeanor defendant for whom adjudication had been withheld—on the jury of his criminal trial was inherently prejudicial to his legal interests. Consequently, Boyd asserts, because his constitutional right to a fair trial was denied when he was convicted by a jury that consisted of said jurors, a new trial must be granted without any further showing of actual bias or prejudice. We disagree.

As an initial matter, Boyd's reliance on our decision in Lowrey v. State, 705 So. 2d 1367 (Fla. 1998), is misplaced. In Lowrey, the First District affirmed the defendant's conviction for carrying a concealed firearm but certified for review the following question as one of great public importance:

> MUST A CONVICTED DEFENDANT SEEKING A
> NEW TRIAL DEMONSTRATE ACTUAL HARM
> FROM THE SEATING OF A JUROR WHO WAS
> UNDER CRIMINAL PROSECUTION WHEN HE
> SERVED BUT THOUGH ASKED, FAILED TO
> REVEAL THIS PROSECUTION?

Id. at 1368 (emphasis added) (quoting Lowrey v. State, 682 So. 2d 610, 612 (Fla. 1st DCA 1996)).  In answering the question in the negative, we distinguished our decision in State v. Rodgers, 347 So. 2d 610, 613 (Fla. 1977), where we held that the presence of a minor on the criminal defendant's jury did not require a new trial absent a showing that the minor's age affected the verdict or prevented a fair trial.  Specifically, we explained that in Rodgers, "no evidence or perception existed to indicate that the disqualified juror rendered an unfair or impartial vote," whereas in Lowrey, "there [was] a clear perception of unfairness, and the integrity and credibility of the justice system [was] patently affected."  Lowrey, 705 So. 2d at 1369-70.  In concluding, we emphasized that we were not overruling Rodgers, but "simply carving out an exception based on the unique circumstances presented."  Id. at 1370.  Accordingly, we quashed the First District's decision and remanded with directions to grant a new trial.  Id.

Juror Striggles' criminal history consisted of the following incidents: (1) making a bomb threat and committing extortion (August 1979); (2) making a threatening phone call (December 1980); (3) twice pleading guilty to reporting false bombings (August 1983 and October 1986), and violating the probation order associated with each conviction; (4) pleading guilty to the misdemeanor of contributing to the delinquency of a minor in Georgia (March 1986); and (5) pleading guilty to one count of possession of a firearm by a convicted felon and

one count of carrying a concealed firearm (March 1988). According to the record, Striggles was about nineteen years old at the time of her first false-bombing reporting in August 1983, and twenty-four at the time of her last known adjudication in March 1988. Certified records indicate that Striggles' civil rights were restored on April 4, 2008—more than six years after she served on the jury of Boyd's 2002 trial. When asked by the trial court how long ago she was involved with the criminal justice system, Striggles responded that she was a juvenile. She did not otherwise apprise the court or counsel of her series of convictions as an adult (beginning in August 1983).

The record also reflects that Juror Rebstock was arrested in Broward County in November 1991 and charged with misdemeanor solicitation of prostitution; however, the presiding court withheld adjudication. During voir dire in the present case, Rebstock reported on the voir dire questionnaire form that he did not have any family or friends involved in the legal system. He did not report his own encounter with law enforcement, and no further inquiries were made by the trial judge or counsel for either party concerning Rebstock's answer to this question.

The circumstances found in the present case do not implicate the "clear perception of unfairness" as contemplated in Lowrey. As the Second District cogently explained, "[t]he purpose of disqualifying a person who has a pending prosecution is to avoid the possibility that that person might vote to convict in the

hope of getting more favorable treatment from the prosecution in [his or her] own case." Thompson v. State, 300 So. 2d 301, 303 (Fla. 2d DCA 1974). Conversely, persons who have already undergone criminal prosecution and been convicted are no longer in a position to curry favor from the State. This is especially true with regard to Juror Striggles since her last known adjudication was approximately fourteen years before Boyd's trial, and with Juror Rebstock, for whom adjudication had already been withheld on his misdemeanor charge approximately a decade before Boyd's trial. Moreover, we see no practical reason to believe that those who, for instance, have not become rehabilitated since being prosecuted over a decade before serving on the jury of a criminal trial are more likely than similarly situated persons—but who have also had their civil rights restored—to favor the State over the defense. See Oregon v. Benson, 384 P.2d 208, 210 (Or. 1963) ("Many [jurors who were convicted of felonies or misdemeanors] have become morally rehabilitated. And we have no reason to believe that those who have not become rehabilitated and are called to jury duty are more likely to show partiality for the state than for the defendant."). We, therefore, reiterate that our decision in Lowrey is limited to its unique set of circumstances and, thus, refuse to extend our ruling therein to Boyd's case and similarly situated cases.

Next, case law—both from this Court and from other appellate courts throughout the nation—supports our rejection of Boyd's claim that he is entitled to

- 11 -

a new trial by virtue of the fact that his jury included a statutorily disqualified convicted felon who had not had her civil rights restored. The United States Supreme Court has emphasized that "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984); see also United States v. Carpa, 271 F.3d 962, 967 (11th Cir. 2001) (citing McDonough, 464 U.S. at 553). Specifically concerning a juror's status as a convicted felon, many appellate courts throughout our nation have echoed this precise viewpoint. For example, the Supreme Court of Michigan explained:

> Although a criminal defendant has a constitutional right to be tried by an impartial jury, a criminal defendant does not have a constitutional right to be tried by a jury free of convicted felons. Instead, the right to be tried by a jury free of convicted felons is granted by statute. And by statute, a violation of this "right" only requires a new trial if the defendant demonstrates that such a violation "actual[ly] prejudice[d]" him.

Michigan v. Miller, 759 N.W.2d 850, 855-56 (Mich. 2008) (footnotes omitted); see also Hunt v. Maryland, 691 A.2d 1255, 1266-67 (Md. 1997) ("What is required of jurors is that they be without bias or prejudice for or against the defendant and that their minds be free to hear and impartially consider the evidence and render a fair verdict thereon."); Washington v. Cleary, 269 P.3d 367, 370 (Wash. Ct. App. 2012) ("The disqualification criterion [for convicted felons addressed] here is by

- 12 -

statute, not the state or federal constitution.  The assignment of error does not then implicate constitutional rights." (citation omitted)); United States v. Humphreys, 982 F.2d 254, 261 (8th Cir. 1992) (holding trial court did not abuse discretion in denying defendant's motion for a new trial on the ground that one juror was previously convicted on embezzlement charge; defendant did not pursue questioning of subject juror on voir dire or further investigate or raise any challenge during trial, and there was no evidence of either bias or unfairness as a result of the seating of juror); United States v. Boney, 977 F.2d 624, 633 (D.C. Cir. 1992) ("W[hile] [w]e think, therefore, that the Sixth Amendment guarantee of an impartial trial does not mandate a per se invalidation of every conviction reached by a jury that included a felon[,] . . . there is still the question whether appellants were entitled to a hearing to determine whether the juror was in fact biased." (internal citations and footnotes omitted)); United States v. Uribe, 890 F.2d 554, 562 (1st Cir. 1989) (denying defendants' claim of entitlement to a new trial in narcotics prosecution because one juror was a convicted felon; explaining "the statutory violation—allowing a convicted felon to serve—did not implicate the fundamental fairness of the trial or the defendants' constitutional rights," and defendants did not otherwise demonstrate a "plausible link between the predicate facts and the prejudice claimed").

We acknowledge the contemplated reasons why felon-jurors sitting in criminal trials may harbor bias in favor of the defense as well as the State. Compare Johnston v. State, 63 So. 3d 730, 739 (Fla. 2011) ("In fact, juror Robinson's positioning as a prior defendant makes bias against Johnston especially unlikely.") (emphasis in original), and Uribe, 890 F.2d at 562 ("The district court found not the slightest basis to conclude that the juror's prior conviction, sentence, or subsequent dealings with the court rendered him more prone to convict a defendant in an unrelated case.  We agree."), with Companioni v. City of Tampa, 958 So. 2d 404, 413 (Fla. 2d DCA 2007) (outlining reasons why convicted felons serving as jurors in criminal trials could be bias both in favor of and against defendants) (citing Humphreys, 982 F.2d at 260-61; Rubio v. Super. Ct. of San Joaquin Cnty., 593 P.2d 595, 600 (Cal. 1979) (en banc)).

However, if a criminal defendant has failed to establish that a particular juror could not be fair and impartial and follow the law as instructed by the trial court, then it is unreasonable to further ascertain whether the juror's status as a convicted felon rendered him or her more favorable to the State or the defense.  In other words, we do not see the efficacy in belaboring the direction in which a felon-juror's bias cuts in the absence of legally sufficient evidence showing that the juror was actually biased against the defendant.  See United States v. Boney, 97 F. Supp. 2d 1, 6 (D.D.C. 2000) ("Even if this Court did not credit the Juror's explanation as

to why he omitted a California conviction from his District of Columbia jury questionnaire[,] . . . additional evidence would still be necessary to establish actual bias and to demonstrate prejudice to defendant's case.").

Besides, we do not think that it is pragmatic to promulgate a per se rule that one's status as a convicted felon denotes inherent bias against a criminal defendant's legal interests. Otherwise, courts would be placed in the precarious position of ordering new trials based not on legally sufficient evidence of actual bias or prejudice, but wholly on gut reactions to sociological generalizations of human tendencies. See Uribe, 890 F.2d at 562 ("To be accorded weight, a bias claim requires more than subjective characterizations unanchored in the realities of human experience."); Boney, 977 F.2d at 633 ("A per se rule [requiring a new trial whenever a felon serves on a jury] would be appropriate, therefore, only if one could reasonably conclude that felons are always biased against one party or another. But felon status, alone, does not necessarily imply bias.").

Indeed, such a categorical rule is repugnant to the actual bias standard established in our jurisprudence. As further analyzed below, for claims of juror bias this Court has repeatedly required that the defendant bear the burden of pointing to evidence on the face of the record which exhibits the subject juror's lack of impartiality. See Lebron v. State, 135 So. 3d 1040, 1058 (Fla. 2014) (citing Carratelli v. State, 961 So. 2d 312, 323 (Fla. 2007)); see also Smithers v. State, 18

So. 3d 460, 465 (Fla. 2009) ("Juror Collins' statements did not show a biased unwillingness to consider potential sentences other than death. . . . Thus, the record does not demonstrate actual bias that would prevent juror Collins from serving as an impartial juror."). Maryland's highest state court has expressed a view of this issue that comports with our <u>Carratelli</u> line of cases. Specifically, the Court of Appeals of Maryland has instructed: " '[B]ias on the part of prospective jurors will <u>never</u> be presumed, and the challenging party bears the burden of presenting facts . . . which would give rise to a showing of actual prejudice.' " <u>Hunt</u>, 691 A.2d at 1267 (emphasis in original) (quoting <u>Davis v. Maryland</u>, 633 A.2d 867, 873 (Md. 1993)); <u>accord</u> <u>Miller</u>, 759 N.W.2d at 857-58.

Hence, in light of the court decisions discussed above, again, we refuse to accept Boyd's position that a criminal defendant is per se entitled to a new trial where he or she was convicted by a jury that included a convicted felon whose civil rights had not been restored. Rather, we hold—as have many other appellate courts throughout this nation—that a criminal defendant is not entitled to relief under such atypical circumstances absent a showing, based on legally sufficient evidence, of actual juror bias against the defendant. In other words, a person's disqualification from jury service by statute does not necessarily implicate a violation of a criminal defendant's constitutional rights if that person somehow served as one of said defendant's jurors. Thus, the only relevant issue presently

before this Court is whether there is legally sufficient evidence that either Juror Striggles or Juror Rebstock was actually biased against Boyd.

Under the "actual bias" standard announced by this Court in Carratelli:

A juror is competent if he or she "can lay aside any bias or prejudice and render his [or her] verdict solely upon the evidence presented and the instructions on the law given to him [or her] by the court." Lusk[ v. State], 446 So. 2d [1038,] 1041 [(Fla. 1984)]. Therefore, actual bias means bias-in-fact that would prevent service as an impartial juror. See United States v. Wood, 299 U.S. 123, 133-34 (1936) . . . . Under the actual bias standard, the defendant must demonstrate that the juror in question was not impartial—i.e., that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record. See Carratelli [v. State], 915 So. 2d [1256,] 1260 [(Fla. 4th DCA 2005)] (citing Jenkins[v. State], 824 So. 2d [977,] 982 [(Fla. 4th DCA 2002))]; see also Patton v. Yount, 467 U.S. 1025, 1038-40 (1984).

Carratelli, 961 So. 2d at 324.

Here, Boyd has not alleged actual bias, nor has he pointed to any evidence in this record indicating that Juror Striggles or Juror Rebstock likely did not deliberate the question of his guilt fairly and impartially. In fact, the record is replete with evidence demonstrating facts that support the opposite conclusion. For instance, when asked during voir dire, Striggles informed the trial court that she was treated fairly by the juvenile system as a juvenile delinquent and that she, as previously noted, had gotten over whatever negative feelings she may have developed about that experience. Striggles also told the prosecutor during voir dire that she did not have a problem recommending a sentence of death where

- 17 -

appropriate because she expected the State to be fair in the presentation of its case against Boyd. Further, Striggles was not part of the group of venire members that expressed moral, religious, or personal beliefs that would have prevented them from returning a verdict of guilty if the State satisfied its burden of proof. She, however, was part of the group that affirmatively agreed with the prosecutor's statement that the verdict reached should be one based solely upon the evidence presented, and not any juror's personal biases or prejudices. Because this record evidence gives no indication that either Juror Striggles or Juror Rebstock harbored any bias against him, we conclude that Boyd has not shown that he is entitled to a new trial. Accordingly, we deny relief on this claim.

## B. Ineffective Assistance of Counsel Claims

Below, Boyd raised numerous ineffectiveness claims regarding defense counsel's performance during voir dire as well as the guilt and penalty phases. The circuit court summarily denied some claims, and denied the remainder following an evidentiary hearing. To prevail on an ineffective assistance of counsel claim under Strickland v. Washington, 466 U.S. 668 (1984), the defendant must demonstrate both deficiency and prejudice:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and

reliability of the proceeding that confidence in the outcome is undermined.

There is a strong presumption that trial counsel's performance was not deficient. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. The defendant carries the burden to overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Judicial scrutiny of counsel's performance must be highly deferential. Strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct. Furthermore, where this Court previously has rejected a substantive claim on the merits, counsel cannot be deemed ineffective for failing to make a meritless argument.

In demonstrating prejudice, the defendant must show a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Long v. State, 118 So. 3d 798, 805-06 (Fla. 2013) (internal citations and alterations omitted).

"[W]hen a defendant fails to make a showing as to one element [of the Strickland standard], it is not necessary to delve into whether he has made a showing as to the other element." Thompson v. State, 796 So. 2d 511, 516 (Fla. 2001); McCoy v. State, 113 So. 3d 701, 708 (Fla. 2013). "Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are

- 19 -

supported by competent, substantial evidence, but reviewing the circuit court's legal conclusions de novo." Id. Where a claim is summarily denied without an evidentiary hearing, "this Court will affirm only when the claim is legally insufficient, should have been brought on direct appeal, or is positively refuted by the record." Jackson, 127 So. 3d at 460 (internal citations and alterations omitted).

### 1. Failure to Conduct Adequate Voir Dire

Boyd first claims that defense counsel's failure during voir dire to question Juror Striggles more in depth about information she revealed concerning her juvenile delinquency record prejudicially denied him the opportunity to discover information material to excusing Striggles from jury service. However, Boyd has not proffered any additional questions that defense counsel should have asked Striggles during voir dire that would have elicited the now-complained-of information from her. See Green v. State, 975 So. 2d 1090, 1105 (Fla. 2008) ("Second, Parker did not render ineffective assistance in failing to ask Guiles more questions, because an allegation that there would have been a basis for a for cause challenge if counsel had followed up during voir dire with more specific questions is speculative." (citing Johnson v. State, 903 So. 2d 888, 896 (Fla. 2005); Reaves v. State, 826 So. 2d 932, 939 (Fla. 2002))). Nevertheless, as discussed above, the record in this case does not show that Striggles harbored any bias against Boyd, and thus, it is not reasonable to conclude that she rendered her duties in any

- 20 -

manner other than fairly and impartially. See Carratelli, 961 So. 2d at 324. The record also reflects that Boyd participated in the jury selection process, agreed to an abbreviated voir dire, and did not object to seating Striggles as a juror because he gave informed consent to his defense team's overall trial strategy. This belies Boyd's contention that he was prejudiced by Striggles' presence on his jury. See Gamble v. State, 877 So. 2d 706, 714 (Fla. 2004) ("[I]f the defendant consents to counsel's strategy, there is no merit to a claim of ineffective assistance of counsel."). Therefore, Boyd has failed to show that counsel's declination to ask Striggles more specific voir dire questions about her criminal record affected the fairness and reliability of the trial proceedings such that our confidence in the outcome is undermined. See Long, 118 So. 3d at 805. Accordingly, we deny Boyd any relief as to this subclaim.

## 2. Failure to Properly Challenge Penalty Phase Outburst

The following cross-examination colloquy between the State and Boyd transpired during the penalty phase:

> Q. Remember when I stood here and said, Mr. Boyd, I'm sorry I have to ask this of you, but did you have your own sperm in your mouth when they swabbed your mouth with the Q-tip and you said no.
> A. But they -- you're right.
> Q. Right. I know I'm right.
> A. But they --
> Q. Now, you said you'd never do nothing like that.
> MR. LASWELL: Objection, your Honor. Mr. Boyd has a right to finish his answer.
> THE COURT: Mr. Loe, I'm going to give Mr. Boyd --

- 21 -

BY MR. LOE:

Q.  I said --

THE COURT:  Excuse me, gentlemen.  Excuse me.  Mr. Boyd, finish your answer and then Mr. Loe may proceed with his next question.

THE WITNESS:  <u>I didn't have my sperm in my mouth, but my sperm was in this young lady right here that they took from me in 1998.  That's where they got my sperm from, out of me.  That young lady right there.  That's where my sperm came from</u>.

[J.M.]:  <u>You raped me</u>.

THE WITNESS:  Yes, sir.  Not out of my mouth.

BY MR. LOE:

Q.  My question was --

A.  Yes, sir.

Q.  -- did you have your sperm in your mouth when they swabbed you in 1998, your answer was no?

A.  No, sir.

Q.  That was my question, wasn't it?  Your answer was no?

A.  The answer is no.

(emphasis added).

The record reflects that the trial judge did nothing to restore order in the court from the gallery outburst or otherwise address the statement in the presence of the jury.  The record also reflects that counsel for the defense did not object or move for a mistrial during the above exchange.  Boyd asserts that such inaction in the midst of the allegedly prejudicial, unsworn statement by the female spectator, J.M., in open court constituted ineffective assistance of penalty phase counsel.  We disagree, since there is competent, substantial evidence in this record supporting the circuit court's finding that defense counsel made a strategic decision not to

- 22 -

raise a challenge to the outburst so as to prevent it from becoming a contentious issue in front of the jury.

This Court has repeatedly held that counsel does not render ineffective assistance by employing strategic decisions made during trial that, in hindsight, did not work to the defendant's advantage. Reynolds v. State, 99 So. 3d 459, 483 (Fla. 2012); Maharaj v. State, 778 So. 2d 944, 959 (Fla. 2000) (citing Medina v. State, 573 So. 2d 293, 297 (Fla. 1990)). Stated differently, "[c]ounsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions. Moreover, strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000) (internal citation omitted).

Here, the transcript for opening statements reflects that defense counsel informed the jury that they would hear testimony during trial that Broward County-area law enforcement had attempted to prosecute Boyd for two unrelated sexual battery incidents spanning over the decade prior to the present case. Counsel then suggested that because they had been embarrassed by unsuccessfully obtaining a conviction when they charged Boyd with a sex offense in an earlier case, the Sheriff's Office and Police Department opportunistically colluded to blame McCloud for the death of Dacosta, the victim in this case. Defense counsel further

indicated during opening statements that the evidence to be presented at trial would show that law enforcement maintained control of the forensic evidence that allegedly linked McCloud to Dacosta's murder, and linked Dacosta to the crime scene—the apartment McCloud at one point had shared with his girlfriend, Geneva Lewis. Indeed, the defense team attempted to elicit such testimony while, for example, cross-examining the lead detective, Glenn Bukata, about the fact that he ordered Lewis and her children to vacate the apartment for several days while crime scene technicians processed the premises for forensic evidence. The defense also elicited testimony from Lewis that, sometime after Boyd's arrest but before she was ordered to leave, Detective Bukata attempted to enter Lewis' apartment while her children were home but she was not. While testifying on his own behalf, Boyd indicated that during his interrogation, Bukata mocked him by addressing Boyd with a racial epithet and boasting: "[W]e told you we was going to get you." Finally, in the course of closing arguments, defense counsel stressed that none of the State's expert witnesses could explain how or when Dacosta's DNA ended up on the furniture in Lewis' apartment. All the above evidence shows that the defense relied heavily on a general trial theory that law enforcement had motive to, and actually did, plant incriminating evidence to incriminate Boyd unlawfully in this case.

Further, defense counsel testified during the evidentiary hearing that he immediately perceived the outburst incident as an opportunity to exploit this theory. According to counsel, based on his prior success in obtaining an acquittal under relatively similar circumstances, he believed the incident at issue in this case presented a rare opportunity to allow the jury to connect law enforcement's prior failures to prosecute Boyd for unrelated sexual battery incidents with the possibility that such failures motivated police to target him in the present sexual battery case—as opposed to challenging the spectator's outburst in open court and risking it becoming a feature of the penalty phase. Thus, defense counsel clearly considered and rejected alternative courses of action. In addition, this decision was reasonable given that it was made under spur-of-the-moment circumstances and based on a past experience that resulted in an outcome favorable to the defense. We conclude, therefore, that defense counsel did not provide ineffective assistance by failing to object or move for a mistrial in response to the asserted penalty phase outburst. See Reynolds, 99 So. 3d at 483; Occhicone, 768 So. 2d at 1048.

Additionally, we agree with the circuit court's determination that Boyd's own actions during the penalty phase invited the asserted error. It is well-settled under Florida law that " 'a party may not make or invite error at trial and then take advantage of the error on appeal.' " Universal Ins. Co. of N. Am. v. Warfel, 82 So. 3d 47, 65 (Fla. 2012) (quoting Sheffield v. Superior Ins. Co., 800 So. 2d 197, 202

- 25 -

(Fla. 2001)). In support of its finding that Boyd invited the asserted error in this case by provoking J.M. in front of the jury, the circuit court cited Norton v. State, 709 So. 2d 87 (Fla. 1997). In Norton, we rejected the defendant's argument that the State's witness improperly commented on cross-examination about the defendant's failure to testify at trial. In so ruling, we noted that error was invited where, in an unsuccessful attempt to make a point on cross-examination, defense counsel probed the witness as to why the defendant bought carpet cleaners when there were no carpets in his car. Id. at 94.

The record here shows that Boyd goaded the woman present in the courtroom gallery when he identified her in front of the jury by partially standing while on the witness stand and twice pointing at the woman while insisting she was the source of his semen that law enforcement officers collected in the State's attempt to convict him of a prior sexual battery charge. The record does not reflect that the woman was causing any disruption during the penalty phase proceeding, or that observers other than the State or Boyd knew of her presence.

Contrary to Boyd's assertion, these circumstances are reminiscent of those found in Norton, given that in both cases some member of the defense's party probed the allegedly prejudicial statements. In Boyd's particular case, J.M. had not responded to or interjected herself into Boyd's testimony until, in an attempt to bolster the defense's theory that a DNA sample from his semen was intentionally

planted on the victim's body by law enforcement, Boyd deliberately and overtly made J.M.'s presence in the courtroom known when the jury was present.

Finally, in further contrast to Boyd's observation, the record does not indicate that the State engaged in "argumentative and antagonistic" cross-examination. Rather, the record shows nothing more than adversarial questioning aimed at calling into question the credibility of a hostile witness as well as the defense's overall theory that, against Boyd's interest, law enforcement planted the incriminating forensic evidence at, and collected it from, the crime scene. See Blanton v. State, 880 So. 2d 798, 801 (Fla. 5th DCA 2004) (describing cross-examination as an "adversarial tool" (citing Crawford v. Washington, 541 U.S. 36 (2004))), approved in part, disapproved in part, 978 So. 2d 149 (Fla. 2008); see also Fla. Power Corp. v. Smith, 202 So. 2d 872, 881-82 (Fla. 2d DCA 1967) ("The very rule that sanctions the calling of a hostile witness permits cross-examination by the adverse party on the subject matter of his original examination as a hostile witness and also permits new evidence to contradict or impeach him."). Accordingly, we deny relief as to this subclaim.

### 3. Failure to Question Jurors about Pretrial Publicity

Next, Boyd argues that the circuit court erred in summarily denying his claim that defense counsel rendered ineffective assistance by failing to question two prospective jurors—Barbara Berberich and then-prospective Juror Striggles—

adequately about their exposures to pretrial publicity concerning Boyd's case.

Under Florida case law, it is well-established that " '[t]he mere fact that jurors were exposed to pretrial publicity is not enough to raise the presumption of unfairness.' The relevant inquiry is whether the jurors can lay aside any opinion or impressions and render a verdict based on the evidence presented in court." Teffeteller v. Dugger, 734 So. 2d 1009, 1020 (Fla. 1999) (quoting Castro v. State, 644 So. 2d 987, 990 (Fla. 1994)).

The transcript in this case indicates that the State conducted its voir dire prior to the defense and questioned the prospective jurors about pretrial publicity and their knowledge of the case. Juror Striggles indicated that she had previously overheard her family conversing about an aspect of the case related to the Boyd Funeral Home, which was a business owned and operated by Boyd's family. However, she immediately stated that she knew nothing about the business or this case. Juror Berberich likewise stated that, although she may have learned about Boyd's case after seeing it on television or reading about it in a newspaper, she did not recall many details other than remembering Boyd's name. Thus, because any follow-up questioning by defense counsel likely would have elicited minimum information not already brought out by the State's voir dire, or otherwise would have elicited cumulative information, Boyd has failed to prove the deficiency prong under the Strickland standard. See id. ("The prosecutor also questioned the

prospective jurors about their exposure to news reporting. In light of this questioning of the prospective jurors, we cannot fault trial counsel for failing to repeat the questioning."); Cole v. State, 841 So. 2d 409, 415 (Fla. 2003).

Assuming, however, that counsel was remiss in not asking Jurors Striggles and Berberich additional questions about pretrial publicity and their knowledge of this case, no prejudice resulted from such inaction. When asked by the State, both prospective jurors explicitly assured that they would not permit whatever information concerning Boyd's case to which they may have been exposed to affect them one way or the other during deliberations if chosen to serve on the jury. Therefore, we find that the record positively refutes a showing that either juror had actual bias against Boyd. See Carratelli, 961 So. 2d at 327 ("[T]he en banc [district] court . . . held that [j]uror Inman's slight familiarity with the case did not rise to th[e] level of actual bias necessary for postconviction relief. We agree. The record plainly shows that juror Inman held no firm opinion except that he could be fair, listen to the evidence, and follow the law. Thus, Carratelli fails to demonstrate prejudice under Strickland.") (internal citation omitted). Accordingly, we affirm the trial court's summary denial of this claim and deny Boyd any relief thereto.

#### 4. Forensic Evidence

#### a. Failure to Request a Frye Hearing

Boyd argues that defense counsel rendered ineffective assistance by failing to request a Frye hearing to challenge the admissibility of the State's bite-mark comparison and fiber analysis evidence, as well as evidence regarding the DNA testing performed by the Bode Laboratory. The Frye test is used to evaluate the "admissibility of expert scientific opinion by ascertaining whether new or novel scientific principles on which an expert's opinion is based 'have gained general acceptance in the particular field in which it belongs.' " Rodgers v. State, 948 So. 2d 655, 666 (Fla. 2006) (quoting Frye, 293 F. at 1014). It follows that trial counsel does not render ineffective assistance by failing to request a Frye hearing when, at the time of trial, there was general acceptance in the scientific community of the scientific evidence at issue. In other words, where the methodology was neither new nor novel, existing case law recognizes that a Frye hearing is not necessary. Foster v. State, 132 So. 3d 40, 69 (Fla. 2013); McDonald v. State, 952 So. 2d 484, 495-96 (Fla. 2006).

As Boyd concedes in his initial brief, the forensic methodologies and evidence presented at trial: trace and microscopic fiber analysis; forensic odontology and bite-mark analysis; and Short Tandem Repeat (STR) DNA technology, were neither new nor novel at the time of his 2002 trial. See, e.g., Long v. State, 610 So. 2d 1276, 1281 (Fla. 1992) (holding State's hair, fiber, and tire-track evidence was admissible in trial for first-degree murder to establish

defendant's identity and to connect him to victim); Mitchell v. State, 527 So. 2d 179, 181 (Fla. 1988) (recognizing admissibility of expert testimony concerning bite-mark analysis as an analytical methodology that is widely accepted in the scientific community); Lemour v. State, 802 So. 2d 402, 407 (Fla. 3d DCA 2001) (holding use of STR DNA testing kit to obtain DNA test results did not present new scientific technique where kit used testing methods that were generally accepted by scientific community), review denied, 821 So. 2d 297 (Fla. 2002); Bradford v. State, 460 So. 2d 926, 929-30 (Fla. 2d DCA 1984) (approving admissibility of odontologist's expert testimony similar to bite-mark analysis (citing Bundy v. State, 455 So. 2d 330 (Fla. 1984))). Boyd, therefore, has failed to demonstrate that a Frye hearing was necessary in this case and, in turn, that the trial court would have granted such a hearing had defense counsel requested one. See Foster, 132 So. 3d at 69; McDonald, 952 So. 2d at 495-96. As such, we conclude that defense counsel was not ineffective in this regard. See Long, 118 So. 3d at 805 (holding defense counsel is not ineffective for failing to present meritless argument).

Boyd maintains that the 2009 National Academy of Sciences (NAS) report on forensic science, while it had not yet been published at the time of his 2002 trial, consisted of sources that were readily available at all relevant times and could have been utilized by defense counsel to challenge the methodology, procedures,

and analyses of the forensic evidence for admissibility purposes at a Frye hearing. Because we have previously addressed this issue in principle, we are not persuaded by Boyd's argument.

In Taylor v. State, 62 So. 3d 1101 (Fla. 2011), we determined that trial counsel's decision not to request a Frye hearing to challenge the admissibility of DNA evidence was reasonable, given that the only authority proffered by the defendant that both challenged the use of DNA evidence and existed at the time of trial were academic articles and isolated, nonbinding decisions. Thus, we concluded that "[w]hile this evidence certainly could have been presented at trial, it was not essential for counsel to be determined to be effective." Id. at 1111 (emphasis in original).

As to the fiber and bite-mark evidence at issue here, Boyd points our attention mostly to a number of isolated articles, news reports, journals, book chapters, and other nonbinding decisions from federal circuits. While these documents were readily available at the time of his trial and could have been relied upon throughout the trial proceedings, Boyd has not cited to any authority that obligated counsel to rely upon the substance of the above documents in order to persuade the trial court to grant a Frye hearing. See id. Regarding the DNA analysis, Boyd has not articulated how or what part of the 2009 NAS report would have called into question the admissibility of the DNA expert testimony in this

case. Rather, he alleges deficiency in a conclusory fashion, asserting "counsel inexplicably failed to challenge the admissibility of DNA evidence analyzed by Bode" and "failed to seek laboratory protocols, validation studies, accreditation studies, equipment maintenance logs and operation manuals, contamination logs and laboratory error rates from any of the three DNA labs involved." Again, Boyd has not pointed to any authority which requires counsel to pursue these measures, and that indicates that counsel otherwise renders ineffective assistance if he fails to do so. See id.

To the extent Boyd characterizes the 2009 NAS report as newly discovered evidence, Boyd cannot show that the portions of the report upon which he relies could "not have been known by the trial court, the party, or counsel at the time of trial," and that he "or defense counsel could not have known of it by the use of diligence." Schwab v. State, 969 So. 2d 318, 325 (Fla. 2007). As Boyd acknowledges, many of the statements in the Summary and Introduction sections of the NAS report to which Boyd cites appear in sources that were readily available at the time of his 2002 trial. Therefore, Boyd has failed to demonstrate that the NAS report constitutes newly discovered evidence. See Johnston v. State, 27 So. 3d 11, 21-23 (Fla. 2010) (finding 2009 NAS report was not newly discovered evidence, in part, because report cited existing publications, some of which were published before victim's murder).

For all of the above reasons, we find this subclaim to be without merit and deny relief thereto.  See Long, 118 So. 3d at 805.

### b.  Failure to Utilize Forensic Experts

Boyd argues that defense counsel's decision not to hire a forensic expert to assist him in challenging the DNA and bite-mark evidence was unreasonable and allowed the State to present its expert testimony virtually unchallenged.  At the time of Boyd's trial, Florida Rule of Criminal Procedure 3.250 provided that "[a] defendant offering no testimony in his own behalf, except his own, shall be entitled to the concluding argument before the jury."  McAvoy v. State, 501 So. 2d 642, 643 (Fla. 5th DCA 1986).  Florida courts have deemed "a defense attorney's case-specific tactical decision not to present evidence because of a desire to retain the first and last closing argument" to be a reasonable trial strategy.  Cole v. State, 700 So. 2d 33, 36 (Fla. 5th DCA 1997).  However, counsel's general practice or blanket policy to preserve the closing argument "sandwich" without examining the surrounding circumstances and potential defenses of the particular case is per se deficient.  Id.

In this case, the record reflects that defense counsel filed a pretrial motion to grant defendant the concluding argument to the jury pursuant to then-applicable Florida Rule of Criminal Procedure 3.250.  Throughout the course of trial, defense counsel was vigilant in ensuring that the defense did not admit any exhibits in

order to preserve the trial court's grant of the closing argument "sandwich." And, other than Boyd's testimony, the defense did not admit any evidence. The record further shows that, using his experience as a former medical examiner, defense counsel Ongley thoroughly cross-examined each of the State's forensic expert witnesses to expose the shortcomings of their conclusions, and echoed those points during the defense's first closing argument. Also, as previously discussed, Boyd stressed during direct examination of his own testimony, and defense counsel Laswell reiterated in the second closing argument the defense's theory, that law enforcement planted incriminating evidence against Boyd in an attempt to frame him for the kidnapping, rape, and murder of Dacosta in this case. Likewise, the defense elicited cross-examination testimony from the State's witness that law enforcement personnel ordered Boyd's girlfriend to vacate the apartment unit where the murder occurred and the forensic evidence was collected, and also that law enforcement maintained unfettered control of the premises for several days.

In light of the above, Boyd failed to show from the record evidence that, in exercising a reasonable trial strategy, counsel did not perform the minimum requirements of professional conduct. See Branch v. State, 952 So. 2d 470, 478-79 (Fla. 2006) (agreeing with trial counsel that his ability to cross-examine the State's witnesses coupled with the importance of the right to present first and last closing arguments were sufficient reasons to avoid the presentation of pathologist and

blood splatter expert, especially given that defense emphasized at trial that defendant did not commit the crime, and that neither postconviction expert identified any substantial factual mistakes made by State's experts). Because, therefore, he cannot establish the deficiency prong under the Strickland standard, we deny Boyd relief as to this subclaim.

### III.  HABEAS PETITION CLAIMS

Claims of ineffective assistance of appellate counsel are appropriately presented in a petition for writ of habeas corpus. Dufour v. State, 905 So. 2d 42, 70 (Fla. 2005). Consistent with the Strickland standard, in determining whether to grant habeas relief for ineffective assistance of appellate counsel, this Court makes the following inquiries:

> [F]irst, whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.

Schoenwetter v. State, 46 So. 3d 535, 563 (Fla. 2010).

The defendant bears the burden of "alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Id. (quoting Freeman v. State, 761 So. 2d 1055, 1069 (Fla. 2000)). Ineffective assistance of appellate counsel claims "may not be used to camouflage issues that should have been presented on direct appeal or in a postconviction motion." Id.

Further, appellate counsel cannot be deemed ineffective for not pursuing a meritless claim. See id. ("If a legal issue would in all probability have been found to be without merit had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel's performance ineffective." (internal citation omitted)).

**A. Failure to Raise Issue of Admissibility of Incriminating Statement**

Boyd argues that the trial court erred, in violation of his constitutional right against self-incrimination, when it denied his motion to suppress the statement he made to police during custodial interrogation, to wit: "What took you so long to catch me?" It is further asserted that because, according to Boyd, trial counsel preserved the error for appellate review, appellate counsel rendered ineffective assistance by failing to raise the issue on direct appeal.

Assuming trial counsel properly preserved the alleged error and that appellate counsel's failure to raise it satisfied the deficiency prong, such lack in performance does not undermine our confidence in the correctness of the result of the direct appeal proceedings. As indicated in our direct appeal decision, we found competent, substantial evidence to support Boyd's conviction of sexual battery:

> The State presented substantial evidence that Boyd sexually battered Dacosta, including evidence that Boyd and Dacosta did not know each other before she encountered Boyd while looking for a ride back to her vehicle after obtaining gas at the Texaco station; that Boyd's semen was on Dacosta's inner thighs; that Dacosta's blood was in Boyd's apartment; and that Boyd's DNA was in material found

under Dacosta's fingernails.  The State also presented testimony establishing the chain of custody of the evidence collected, providing evidence against Boyd's theory that Detective Bukata planted evidence so that it would match Boyd's and Dacosta's DNA. Bruising on Dacosta's inner thighs and vaginal area was consistent with either consensual or nonconsensual intercourse.  Dacosta was last seen alive with Boyd.

Boyd, 910 So. 2d at 181.

This same evidence, in addition to evidence "that Dacosta was stabbed with a Torx screwdriver thirty-six times in the chest and four times in the head" and "had twelve wounds on her right hand that were consistent with defensive wounds," supported our determination that there was also competent, substantial evidence to uphold the jury's guilty verdicts for armed kidnapping and premeditated murder.  Id. at 182-84.  Finally, we determined that, based on Boyd's convictions of sexual battery and armed kidnapping, the record on appeal further supported the first-degree murder conviction on the basis of felony murder.  Id. at 182.  Therefore, even had Boyd's statement: "What took you so long to catch me?" not be adduced at trial, his convictions and sentence of death would have been upheld, given the overwhelming amount of remaining evidence establishing Boyd's guilt.  See Williamson v. State, 123 So. 3d 1060, 1056-66 (Fla. 2013) ("[T]o establish prejudice under Strickland, . . . a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury, and a verdict or conclusion only weakly supported by the record is more likely to have

- 38 -

been affected by errors than one with overwhelming record support." (citation omitted)); Simmons v. State, 105 So. 3d 475, 492 (Fla. 2012) (holding that, even if trial counsel's stipulation that defendant was source of semen found inside victim's body constituted deficient performance, no prejudice could be shown in light of overwhelming evidence of guilt, including evidence of victim's blood found inside defendant's car; testimony of eyewitnesses who had seen victim screaming for help from defendant's car on the night of the murder; and the fact that tire tracks of defendant's car were found near the location where victim's body was found). Accordingly, Boyd is not entitled to relief on this claim.

## B. Failure to Raise Fundamental Error as to Improper Comment

Boyd raises his previous ineffectiveness claim for failure to properly challenge a penalty phase spectator's outburst: "You raped me," see Section II.B.2., supra, but under the guise of ineffective assistance of appellate counsel for failure to raise the claim on direct appeal. Because, as noted, defense counsel did not preserve the issue for appeal during the penalty phase of trial, appellate counsel cannot be ineffective for failing to raise the issue on direct appeal unless the claim involves fundamental error. See Archer v. State, 934 So. 2d 1187, 1205 (Fla. 2006). An error is fundamental if it "reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." Rodriguez v. State, 919 So. 2d 1252, 1282 (Fla.

2005). Concerning improper comments made in the penalty phase, to be fundamental error the comments "must be so prejudicial as to taint the jury's recommended sentence." Fennie v. State, 855 So. 2d 597, 609 (Fla. 2003) (citing Thomas v. State, 748 So. 2d 970, 985 n.10 (Fla. 1999)).

The cases to which Boyd cites for support are factually distinguishable to the present circumstances and, thus, are uninstructive. In Arbelaez v. State, 626 So. 2d 169 (Fla. 1993), for instance, the murder victim's mother, upon being called by the State to testify, was crying during the administration of the oath. Id. at 176. The prosecutor requested a break for the mother to compose her emotions, after which time she then called the defendant a "murderer" and a "son of a bitch" in Spanish while the jury was still present. Id. Boyd also likened the facts of this case to those in Evans v. State, 995 So. 2d 933 (Fla. 2008), where the defendant raised a claim of ineffective assistance of counsel for failure to object to a juror's participation in the trial. Id. at 945. Particularly, the defendant asserted that he was prejudiced when the juror interjected herself into the trial as an unsworn witness to answer a question concerning a traffic light that was germane to the defense's theory of the case. Id. Neither of these decisions contemplates a situation in which the defendant incited the complained-of outburst. Id.

To the contrary, Boyd goaded the spectator by partially standing while on the witness stand and twice pointing at her while insisting she was the source of

Boyd's semen that law enforcement officers collected in the State's attempt to convict him of a prior sexual battery charge. The record does not reflect that the spectator was causing any disruption during the penalty phase proceeding, or that observers other than the State or Boyd knew of her presence. In addition, before the asserted outburst, the jury was twice informed that Boyd was the subject of prior sexual battery charges. And, although the jury could have easily inferred that the subject spectator was the alleged victim from at least one of the charges, there was no reasonable basis upon which to believe that Boyd actually committed the offense given that the jury was also informed of his acquittals from all prior charges. In light of these circumstances, whatever prejudice that Boyd may have suffered as a result of the outburst is self-inflicted. Further, we are not convinced that the jury unanimously recommended the sentence of death only with the assistance of this particular incident. Accordingly, we deny this claim as meritless. See Schoenwetter, 46 So. 3d at 563; Rutherford v. Moore, 774 So. 2d 637, 644 (Fla. 2000) ("The failure to raise meritless claims does not render appellate counsel's performance ineffective.").

## IV. CONCLUSION

Based on the foregoing analysis, we affirm the circuit court's denial of postconviction relief. We also deny Boyd's petition for writ of habeas corpus.

It is so ordered.

LABARGA, C.J., and PARIENTE and PERRY, JJ., concur.
CANADY and POLSTON, JJ., concur in result.
LEWIS, J., concurs in result only with an opinion.
QUINCE, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

LEWIS, J., concurring in result only.

Under the Florida Statutes, a person who has been convicted of a felony is disqualified from service on a jury unless and until his or her civil rights have been restored. See § 40.013(1), Fla. Stat. (2015). However, the statute fails to provide any specific remedy when a disqualified individual actually serves on a jury. In my view, the dispositive issue should be whether the jury was properly comprised under the law, not whether the defective jury performed properly. Therefore, when a convicted felon serves on a jury, as occurred in this case, a structural defect is present that invalidates the jury from the outset, and whether the jury reached the correct determination is simply not the relevant standard. Instead, I would conclude that the verdict is per se invalid.

I am surprised that neither Florida courts, nor many courts in other jurisdictions that have addressed this issue, have reached this conclusion. Rather, a significant number have determined, as the majority holds today, that actual bias is the proper inquiry where a convicted felon serves on a jury. See, e.g., Companioni v. City of Tampa, 958 So. 2d 404, 417 (Fla. 2d DCA 2007) (holding that in civil

- 42 -

cases in which individuals with prior felony convictions serve on a jury, "it is entirely appropriate to require a showing of actual bias or prejudice before setting aside a verdict"); United States v. Bishop, 264 F.3d 535, 554 (5th Cir. 2001) ("[O]nce the trial is complete, a felon's serving as a juror is not an automatic basis for a new trial. The defendant must demonstrate that the juror was actually biased or fundamentally incompetent."); Coughlin v. Tailhook Ass'n, 112 F.3d 1052, 1059 (9th Cir. 1997) ("[T]he participation of a felon-juror can be the basis for a new trial if the juror's participation in the case results in 'actual bias' to one or more of the parties."); United States v. Humphreys, 982 F.2d 254, 261 (8th Cir. 1992) ("In an effort to obtain a new trial, it is incumbent upon the defendant to clearly demonstrate that the juror's lack of qualifications presented actual bias or prejudice, affecting the juror's impartiality and impacting the fairness of the trial. A challenge after the verdict without such a showing comes too late." (footnote omitted)); United States v. Boney, 977 F.2d 624, 633-35 (D.C. Cir. 1992) (holding that "the Sixth Amendment guarantee of an impartial trial does not mandate a per se invalidation of every conviction reached by a jury that included a felon" and remanding for an evidentiary hearing to determine whether the juror's failure to disclose his status resulted in actual bias); Young v. United States, 694 A.2d 891, 895 (D.C. 1997) ("[T]he fact that the juror was statutorily ineligible to serve due to a felony conviction does not constitute prejudice per se meriting automatic

reversal."); People v. Duffy, 923 N.Y.S.2d 822, 825 (N.Y. Dist. Ct. 2011) (noting that "there is no per se rule requiring the setting aside of a jury verdict upon the postverdict discovery that a juror had previously been convicted of a felony," and concluding that the defendant had failed to demonstrate actual bias).

In my opinion, whether actual bias existed should not be the appropriate consideration where a disqualified juror served in violation of statutory law. Rather, I would conclude that if a jury is not properly comprised pursuant to section 40.013(1), it is incapable of rendering a valid verdict or advisory sentence. Therefore, if writing on a clean slate, I would hold that the presence of a convicted felon on Boyd's jury invalidated his trial from the outset, and he would be entitled to a new trial. Nevertheless, I recognize that the weight of the authority, including Florida precedent, is contrary to my position.

Other states, such as Texas and Virginia, have provided statutory remedies where a disqualified individual served on a jury. See Tex. Code Crim. Pro. Ann. art. 44.46(2) (Vernon 2014) (criminal defendant must demonstrate "significant harm" by service of disqualified juror); Va. Code Ann. § 8.01-352(B) (2014) (new trial will not be granted unless it appears that the legal disability of juror "probably cause[d] injustice"). As these states have done, I urge the Legislature to review the current law in Florida and enact a specific remedy to address the situation where a verdict is entered by a jury that was not properly comprised pursuant to the

directives of the Florida Statutes. Without such a remedy in place, actual bias will remain the standard, despite the fact that this burden is virtually impossible to meet. Thus, the clear prohibition is meaningless. This extremely high standard operates to undermine the statutory prohibition in section 40.013(1). If service by a convicted felon almost never invalidates a verdict, subsection (1) basically has no operational effect post-trial.

Despite my deep disagreement with the use of the actual bias standard in this context, statutory change is required to address the current injustice in Florida. Until the Legislature takes action, a party must meet a nearly insurmountable burden to obtain relief where a convicted felon served on his or her jury in clear violation of the law. Therefore, I am compelled to concur in result only.

QUINCE, J., dissenting.

I believe, under the circumstances of the case, the defendant is entitled to a new trial because an unqualified person served on this capital jury. It is undisputed that Juror Striggles was a convicted felon whose civil rights had not been restored at the time she served on the jury that convicted Boyd. Section 40.013(1), Florida Statutes (2001), provides that any person who has been convicted of a felony and whose civil rights have not been restored shall not be qualified to serve as a juror. This statutory directive is clear and unequivocal. Juror Striggles should not have been on this jury.

It is impossible to tell whether bias from such a situation cuts for or against the defendant, and a defendant should not be placed in the position of having to demonstrate bias. Because in most instances demonstrating prejudice is difficult, if not impossible, there should be a per se rule that would require a new trial when a disqualified person serves on a jury. Thus, Boyd should be given a new trial.

Two Cases:

An Appeal from the Circuit Court in and for Broward County,
    Andrew L. Siegel, Judge - Case No. 061999CF005809A88810
And an Original Proceeding – Habeas Corpus

Neal Andre Dupree, Capital Collateral Regional Counsel, Southern Region, Suzanne Myers Keffer, Chief Assistant, Capital Collateral Regional Counsel, Southern Region, and Scott Gavin, Staff Attorney, Capital Collateral Regional Counsel, Southern Region, Fort Lauderdale, Florida,

    for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, Florida,

    for Appellee/Respondent